OFFICE OF CONSUMERS' COUNSEL, APPELLANT, *v.*
PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.
CITY OF COLUMBUS, APPELLANT, *v.*
PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

(Nos. 80-191 and 80-349—Decided December 10, 1980.)

*Mr. William A. Spratley,* consumers' counsel, *Mr. John P. Hopkins, Ms. Gretchen J. Hummel* and *Mr. Orla E. Collier,* for appellant Consumers' Counsel.

*Mr. Gregory S. Lashutka,* city attorney, *Mr. Patrick M. McGrath* and *Mr. John W. Bentine,* for appellant city of Columbus.

*Mr. William J. Brown,* attorney general, *Mr. Marvin I. Resnik* and *Mr. Harris S. Leven,* for appellee.

*Messrs. Porter, Wright, Morris & Arthur, Mr. Samuel H. Porter, Mr. Curtis A. Loveland* and *Mr. William J. Kelly, Jr.,* for intervening appellee.

WILLIAM B. BROWN, J.   For the reasons set forth, we affirm the commission's order in its entirety.

I.

Appellants contend that R. C. 4909.39 renders invalid the permanent rate increases ordered herein within Columbus until March 30,1980. R. C. 4909.39, in relevant part, provides:

"If the public utilities commission, after the hearing referred to in Sections 4909.34 to 4909.36 of the Revised Code, is of the opinion that the rate * * * so fixed by ordinance is or will be unjust, unreasonable, or insufficient to yield reasonable compensation for the service, the commission shall fix and determine the just and reasonable rate * * * to be charged * * * by such public utilities during the period so fixed by ordinance, which period shall not be less than two years, and order the rate * * * so fixed substituted for the rate * * * fixed by ordinance."

Appellants argue that because existing permanent rates in Columbus were fixed by the commission pursuant to a complaint and appeal under R. C. 4909.34 from an earlier Columbus rate ordinance (No. 881-77), the commission is prohibited from ordering permanent rate adjustments effective during the two-year period included in R. C. 4909.39, *i.e.,* until March 30, 1980. While agreeing with appellants that this two-year period terminated on March 30, 1980,[1] the commission counters that the two-year prohibition of R. C. 4909.39 should apply *only* to rate ordinances, and not to rate adjustments ordered by the commission, because it was included in the statute primarily to prevent a municipality from undermining a commission order concerning the unreasonableness of an existing rate ordinance by passing a new rate ordinance to be effective immediately after the issuance of the commission's order. Cf. *Ohio Edison Co.* v. *Pub. Util. Comm.* (1977), 52 Ohio St. 2d 123.

In arguing that the two-year prohibition applies equally to permanent rate adjustments ordered by the commission, appellants rely on language in *State, ex rel. Brainard,* v. *McConnaughey* (1940), 137 Ohio St. 431, 435-436, and *Ohio Edison Co., supra,* at page 126, suggesting that rates fixed by the commission pursuant to a complaint and appeal from a rate ordinance are to be effective "for not less than two

---

[1] Appellants assert that the two-year period of R. C. 4909.39 commenced on March 31, 1978, and thus terminated on March 30, 1980, because the commission's order in C&SOE's preceding complaint and appeal from Ordinance No. 881-77 (enacted May 23, 1977, effective June 22, 1977) was *issued* on March 31, 1978. Case No. 77-545-EL-AIR. Since we rule that the two-year prohibition of R. C. 4909.39 is inapplicable to rate adjustments ordered by the commission, we do not consider whether the two-year period commenced on March 31, 1978.

years." Both *Brainard* and *Ohio Edison Co.,* however, considered the application of the two-year prohibition to rate ordinances, and not to rate adjustments ordered by the commission.

Appellants argue further that if the two-year prohibition were applied only to rate ordinances (and not applied equally to permanent rate adjustments ordered by the commission), the commission's ability to order permanent rate relief effective during this two-year period would prejudice municipal ratepayers because a municipality would lose its power to enact a rate ordinance, which a utility would be required to confront in an ensuing rate case, in circumstances where a utility filed its application for permanent rate relief during this two-year period.[2]

Assuming, *arguendo,* that in a rate case before the commission the absence of a rate ordinance (and a utility's complaint and appeal therefrom) was necessarily prejudicial to municipal ratepayers, we would still reject appellants' argument. As illustrated by the facts of the instant case, it is not apparent that a municipality would lose its power to enact a rate ordinance, which a utility would be required to confront in an ensuing rate case, in the above-described circumstances. Herein, C&SOE filed its notice of intent to apply for permanent rate relief on November 17, 1978, approximately 16 months prior to March 30, 1980, the assumed termination date of the two-year period. See fn. 1. Shortly thereafter, and during this two-year period, on January 29, 1979, the Columbus City Council *enacted* Ordinance No. 105-79, to be *effective* March 31, 1980, *i.e.,* the day after the termination of the above two-year period. In response, on March 1, 1979, C&SOE filed a complaint and appeal from this rate ordinance in addition to an application for permanent rate relief. In the ensuing consolidated rate case, C&SOE was indeed required to confront this rate ordinance.

Appellees,[3] on the other hand, argue, in essence, that if

---

[2] Ordinarily, a utility must give a municipality three months notice of its intent to file an application for permanent rate relief. R. C. 4909.43(B). The municipality can then enact a rate ordinance, requiring a utility (which finds such ordinance unacceptable) to file a complaint and appeal from that rate ordinance in addition to its application for permanent rate relief. R. C. 743.26, 743.28, 4909.18 and 4909.34.

[3] The commission, intervening-appellee C&SOE, and various utility companies

the two-year prohibition of R. C. 4909.39 were applicable to permanent rate adjustments ordered by the commission, the commission's ability to balance the conflicting interests of utility companies and various ratepayers would be undermined. We agree.

First, where existing permanent rates were earlier fixed by the commission pursuant to a complaint and appeal under R. C. 4909.34 (as is the case herein), the commission would be powerless to order permanent rate adjustments for two years, even if existing rates were inadequate to yield a fair and reasonable return under R. C. 4909.15. Such regulatory inflexibility is unsound. Moreover, the fact that the commission would still be competent to order emergency rate relief under R. C. 4909.16 if a utility were sufficiently distressed does not eliminate the unsoundness of freezing inadequate permanent rates in circumstances where a utility's distress is insufficient to support a claim for emergency relief.

Second, assuming that the two-year prohibition were applied to permanent rate adjustments ordered by the commission, the commission would be powerless to order a permanent rate adjustment for two years only if the existing permanent rates were earlier fixed pursuant to a complaint and appeal under R. C. 4909.34, and not pursuant to a utility company's application for permanent rate relief under R. C. 4909.18. There is no apparent justification for this disparity. Additionally, such a disparity would perhaps increase the commission's workload and regulatory expenses generally since municipalities would be encouraged to enact rate ordinances for the sole reason that a two-year rate freeze would result from the ensuing complaint and appeal.

Finally, while ratepayers within a municipality that enacted a rate ordinance (requiring a utility company to complain and appeal) would be insulated by this two-year rate freeze, ratepayers in unincorporated areas or in those municipalities that did not enact rate ordinances would not be so insulated. In a subsequent application for permanent rate relief by a utility pursuant to R. C. 4909.18, or in a subsequent com-

which were permitted to file *amicus* briefs herein have submitted arguments in support of the commission's construction of R. C. 4909.39. "Appellees" is herein a collective reference to any of the above or their respective arguments.

plaint against a utility by any person, firm, corporation or the commission itself pursuant to R. C. 4905.26, the commission would be competent to adjust permanent rates during this two-year period only in those portions of a utility's service territory not covered by rate ordinances. Such unequal treatment among ratepayers has little to recommend it.

For the foregoing reasons, we hold that the two-year prohibition of R. C. 4909.39 only applies to rate ordinances, and does not apply to rate adjustments ordered by the commission.

## II.

The commission authorized a .5 percent attrition allowance to the cost of C&SOE's proprietary capital, *i.e.*, common equity and preferred stock, in determining the rate of return authorized under R. C. 4909.15.[4] This is the first case in which the commission has granted an allowance for attrition. Appellant Consumers' Counsel argues that attrition allowances are *per se* unlawful; and, alternatively, that the allowance herein is unsupported by the record. We reject both arguments.

## A.

Attrition is "the tendency of a rate of return to diminish in a period of rising costs***." *Masury Water Co.* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 147, 150. Attrition results when increasing costs upset the balance between revenues, expenses and rate base investment so that a utility company does not actually realize the rate of return which was authorized. See *Legislative Utility Consumers' Counsel* v. *Granite, State Electric Co.* (N.H. 1979), 402 A. 2d 644, 646. Numerous jurisdictions partially adjust for the effects of such increasing costs by granting an allowance for attrition, *i.e.*, by increasing the otherwise allowable rate of return.[5] See cases collected at 7 P.U.R. Digest 2d, Return, Section 35.

---

[4] C&SOE requested a .5 percent attrition allowance to be applied to its overall cost of capital, including debt. The commission concluded that R. C. 4909.15(D)(2)(a) prohibits the application of an attrition allowance to the cost of debt, and thus applied the above percentage only to the cost of proprietary capital. Expressed as an adjustment to the overall cost of capital, the attrition allowance is .24 percent. C&SOE has not challenged the commission's construction of R. C. 4909.15(D)(2)(a).

[5] The Michigan Public Service Commission described the circumstances in which an attrition allowance might be justified as follows:

In prior cases, this court has refused to compel the commission to grant an allowance for attrition. See, *e.g., Dayton Power & Light Co.* v. *Pub. Util. Comm.* (1980), 61 Ohio St. 2d 215; *Masury Water Co.* v. *Pub. Util. Comm., supra; C&SOE* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 120; and *Franklin Co. Welfare Rights Org.* v. *Pub. Util. Comm.* (1978), 55 Ohio St. 2d 1. In none of these prior cases, however, did we suggest that the commission could not grant an attrition allowance in appropriate circumstances.

Consumers' Counsel's argument that attrition allowances should be unlawful *per se* is essentially as follows: The commission ordinarily adjusts some test-year expenses to reflect current conditions and adjusts the rate base to include a portion of construction work in progress.[6] These adjustments tend to reduce the amount of attrition which would otherwise occur. Next, any attrition which in fact does occur is already reflected, via investor expectations in the capital market, in the cost of proprietary capital under the commission's discounted cash flow method of determining capital costs.[7] Con-

---

" 'In a rate case, revenues, expenses, and rate base investment are all adjusted to test period levels and an appropriate rate of return is then authorized. If, from the test period forward, revenues, expenses, and investment all grow proportionately, the test period relationships and the rate of return will remain constant, although the total dollars of each element will change. But if investment grows faster than income (the net of the other two factors—revenues and expenses), the rate of return will decline, for the commission-created balance of revenues, expenses, and investment becomes imbalanced. If this unequal growth occurs, a rate order calculated only to relieve the revenue deficiency as shown by the adjusted test period results will not produce the authorized level of earnings.' " *Re Michigan Bell Telephone Co.* (Mich. 1976), 15 P.U.R. 4th 209, 239.

[6] The commission herein adjusted tax rates and most wages; and included 50 percent of the construction work in progress on the Zimmer nuclear plant in the rate base.

[7] In two recent cases, this court has noted the tendency of capital markets to adjust for anticipated attrition. See *Masury Water Co., supra,* at page 151; and *Dayton Power & Light Co., supra,* at page 217.

Under the discounted cash flow method, the cost of common equity to an enterprise is based upon the equity's current dividend yield (expressed as a percentage of market price) adjusted to reflect a growth factor. The conclusion that the cost of such equity will, to some degree, reflect inflationary expectations (and anticipated attrition) is based upon the premise that investors will require an increased yield to compensate for the industrial and financial risks to the enterprise associated with rising costs. *Ceteris paribus,* the market price of the equity would be bid down. In *Masury Water Co., supra, Dayton Power & Light Co., supra,* and in a number of additional cases, the commission in part relied on this premise in denying attrition allowances.

sumers' Counsel then concludes that an attrition allowance should never be permitted for reason that it necessarily duplicates a premium already included in the cost of capital. As such, an attrition allowance would merely serve as an unwarranted disincentive to efficient utility operations or as a cushion for those investors who underestimate future inflation or its effect on utility companies.[8]

We cannot accept this argument. Since the above adjustments to items of expense and to the rate base are piecemeal, static and relatively small in magnitude, they accomplish little in meeting attrition. See Note, The Use of the Future Test Year in Utility Rate-Making, 52 Boston Univ. L. Rev. 791, 796-797. Secondly, while there is a tendency for the cost of capital, via investor expectations in the capital market, to adjust for anticipated attrition, there is no assurance that such adjustment is complete. To the extent that this capital market adjustment is not complete, an allowance for attrition would not duplicate a premium already included in the cost of capital, and thus would not necessarily serve as a disincentive to efficient utility operations or as a cushion for investors who underestimate future inflation or its effect on utility companies.

For reason that the commission is the proper forum for considering the above factual issues, we hold that under R. C. 4909.15,[9] the commission may grant a utility company an attrition allowance applicable to the cost of its proprietary capital.

---

[8] In past cases, the commission has considered these latter policy considerations in determining the appropriateness of an attrition allowance. See, *e.g., Re Ohio Gas of Ohio, Inc.* (March 31, 1979), case No. 76-704-GA-CMR, at page 9; *Re Ohio Power* (April 16, 1979), case No. 78-676-EL-AIR, at page 22.

[9] With respect to the statutory basis under R. C. 4909.15 for this holding, the commission offers two alternatives: (1) an attrition allowance can be an element of "fair and reasonable rate of return" under R. C. 4909.15(A)(2) if "fair and reasonable rate of return" is considered to be a broader concept than "cost of capital." See *Re Dayton Power & Light Co.* (March 9, 1979), case No. 78-92-EL-AIR, at page 26; or (2) assuming, *arguendo,* that an attrition allowance is *not* an element of the fair and reasonable rate of return under R. C. 4909.15(A)(2), a finding that attrition will occur can, pursuant to R. C. 4909.15(C) and 4909.15(D), support a similar offsetting adjustment in service rates. Since we have not heard argument concerning the ramifications of these alternatives, and their possible relationship to the commission's construction of R. C. 4909.15(D)(2)(a), see fn. 4, we defer disposition of this issue.

### B.

Consumers' Counsel alternatively argues that the record will not support the .5 percent attrition allowance to the cost of proprietary capital that the commission granted. We disagree.

By omitting a specific formula in R. C. 4909.15 for determining an appropriate rate of return, the General Assembly has vested the commission with broad discretion. Similarly, this court has consistently deferred to the expertise of the commission in determining an appropriate rate of return unless such determination is "manifestly against the weight of the evidence and***so clearly unsupported by the record as to show misapprehension or mistake or willful disregard of duty." *C&SOE* v. *Pub. Util. Comm.*, *supra* (58 Ohio St. 2d 120).

Limited judicial review of a rate of return determination is sound for reason that while "cost of capital analyses***have an aura of precision about them,***they are fraught with judgments and assumptions." *Re Dayton Power & Light Co.* (March 9, 1979), case No. 78-92-EL-AIR, at page 26. Since the calculation of attrition, and the determination of the appropriateness of an offsetting allowance, are fraught with similar judgments and assumptions, we think it appropriate to apply a similar limited standard of review. See *Dayton Power & Light Co.* v. *Pub. Util. Comm.*, *supra* (61 Ohio St. 2d 215), at page 219 (Paul W. Brown, J., concurring).

The evidence in the record herein was clearly sufficient to support the commission's granting of a .5 percent attrition allowance to the cost of C&SOE's proprietary capital. There was evidence that the then current inflation rate was almost double that occurring over the preceding ten years; and that electric utilities, given their service obligations, their capital requirements and the regulatory restraints on their revenues, are particularly disadvantaged by inflation and high interest rates.[10]

The record also contains evidence that C&SOE's financial integrity was substantially inferior to that of electric utilities in general. For example, while the average electrical utility's

---

[10] Inflation and high interest rates have increased C&SOE's embedded cost of debt which in turn has reduced the amount available as a return on equity, and have also decreased C&SOE's interest coverage (*viz.*, C&SOE's ability to "cover" its interest expense with income before interest and tax expenses).

earnings on equity in recent years have been approximately 2 to 2.5 percent less than its cost of equity, C&SOE's earnings on equity over a recent 12-month period were approximately 4 percent less than its cost of equity. Additionally, C&SOE has been in emergency situations twice during the last six years, and evidence was presented that the underlying difficulties were continuing. In fact, Consumers' Counsel's own expert testified that he adjusted his cost of equity calculation to account, prospectively, for both inflation and the particular difficulties associated with the construction of C&SOE's nuclear facilities. Finally, there was expert testimony that given the impact of inflation on the utility industry, C&SOE's forecasted load growth, and thus its revenues, would not offset the inevitable post test-year cost increases associated with its rate base investments and related expenses.

Expert opinions on the cost of common equity varied from 12.5 percent to 15 percent. After appraising the assumptions underlying the respective experts' estimates, the commission adopted a figure of 14.27 percent. With respect to the cost of preferred stock, the experts agreed on a figure of 8.77 percent which the commission adopted. The commission then added the .5 percent attrition allowance to these two figures, making them 14.77 and 9.27 percent, respectively. Expressed as a percentage of the overall cost of capital (which also includes the cost of debt)[11] this attrition allowance is .24 percent.

Given the record evidence, the magnitude and variance of the respective experts' estimates as to the cost of common equity in comparison with the size of the attrition allowance which was granted, and the inexactitude inherent in this endeavor, the commission did not abuse its discretion by granting the above-described attrition allowance.

### III.

In order to fix and determine service rates within Columbus pursuant to C&SOE's complaint and appeal from Ordinance No. 105-79, the commission was required to allocate a

---

[11] The overall cost of capital is calculated by computing a weighted average of the costs of common equity, preferred stock and debt. The commission believes that R. C. 4909.15(D)(2)(a) prohibits the application of an attrition allowance to the cost of debt. See fn. 4.

portion of C&SOE's rate base and related operating expenses to Columbus. See *Franklin Co. Welfare Rights Org., supra* (55 Ohio St. 2d), at pages 6-7. Adopting C&SOE's methodology, the commission allocated C&SOE's rate base and related operating expenses uniformly throughout the entire service territory including Columbus. The city herein challenges two assumptions underpinning this uniform allocation.

Since a significant portion of an integrated utility's rate base assets and related operating expenses necessarily serve numerous customers without regard to political boundaries, direct allocation of these items by political subdivision to a significant degree is impossible. Instead, the commission must adopt a reasonable, indirect method of apportioning among political subdivisions those rate base assets and related operating expenses benefiting more than one particular sub-division. In recognition of the complexity of this issue, the General Assembly has not specified a method of allocation, and has thus vested the commission with broad discretion. This court's position has been to leave undisturbed any such method adopted by the commission which is not unreasonable. *Ohio Edison Co.* v. *Pub. Util. Comm.* (1962), 173 Ohio St. 478, 484, and paragraph three of the syllabus; cf. *Canton* v. *Pub. Util. Comm.* (1980), 63 Ohio St. 2d 76, 78-81.

The city argues that the commission erred by uniformly allocating C&SOE's rate base and related operating expenses throughout C&SOE's entire service territory for the reason that such uniformity ignores alleged cost of service differences between Columbus and the rest of C&SOE's service territory which are (1) attributable to population density and (2) attributable to demand and load characteristics. We disagree.

The commission's conclusion that there existed no cost of service differences attributable to population density rested in part upon testimony that other portions of C&SOE's service territory, in addition to Columbus, have urban populations. More significantly, this conclusion was also based upon the assumption that no significant cost of service differences attributable to population density would exist even if Columbus were decidedly more urban than the rest of C&SOE's service territory. This latter assumption was grounded upon expert opinion that cost of service factors associated with urban and

rural service areas, respectively, "tend to offset each other insofar as the allocation of costs to the city is concerned." We find this evidence ample to support the commission's decision to ignore alleged cost of service differences attributable to population density.

The commission's conclusion that there existed no cost of service differences attributable to demand and load characteristics was based in part upon the assumption that the relationship between average and peak demands of Columbus and non-Columbus customers are substantially equivalent. In *Columbus* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 103, 105, we deferred to the commission's acceptance of this assumption where there was expert testimony that the assumption was not prejudicial to Columbus ratepayers, and where the assumption could not be verified because most customers in C&SOE's service territory did not have demand meters. See *Id.,* at fn. 2. The city herein seeks to distinguish the above case by arguing that this assumption is now verifiable because C&SOE possesses a general study of its general service (*i.e.,* mostly non-residential) customers which the city contends C&SOE could have utilized to analyze Columbus and non-Columbus customers on a comparative basis.

To the contrary, we do not think the existence of this study is sufficient to distinguish *Columbus* v. *Pub. Util. Comm., supra.* C&SOE offered evidence that it would take three months additional work to segregate its general service customers into Columbus and non-Columbus groupings; and that, in any event, the resulting analyses would be of limited utility since comparative figures on small-use residential customers, *i.e.,* those customers for whom comparative figures might be most revealing, would still be unavailable. Additionally, C&SOE's expert testified that there was no basis for concluding that the assumption was prejudicial to Columbus customers, and that he knew of no public utility in the United States that kept demand data by political subdivision. Upon this evidence, we refuse to distinguish *Columbus* v. *Pub. Util. Comm.* and thus sustain the commission's decision to ignore alleged cost of service differences attributable to demand and load characteristics.

Finally, the city argues that even assuming the commis-

sion properly allocated the rate base and related operating expenses, the commission still erred by failing to find the exact rate of return which the authorized increase in service rates in Columbus would produce as a percentage of the Columbus rate base. The city asserts that this failure is possibly prejudicial to Columbus customers because the resulting rate of return in Columbus could be greater than the authorized rate of return for the entire service territory depending upon "consumption patterns and rate structures."

Even assuming that this issue can be raised in the instant proceeding as well as in a complaint proceeding pursuant to R. C. 4905.26, we must reject the city's argument. Any prejudice at this point to Columbus customers is speculative since the city has not introduced supporting evidence before this court or the commission.

The commission's order, being neither unreasonable nor unlawful, is hereby affirmed.

*Order affirmed.*

P. BROWN, SWEENEY and DOWD, JJ., concur.

CELEBREZZE, C. J., and HOLMES, J., concur in the judgment.

LOCHER, J., dissenting. Since I am of the opinion that the December 12, 1979, order of the Public Utilities Commission ("commission") is unreasonable, unlawful, and unsupported by the evidence adduced at hearings, I respectfully dissent from the majority opinion.

## I.

A review of the pertinent factual pattern herein is necessary to fully comprehend the situation that this case presents.

On May 23, 1977, the city of Columbus ("city") enacted Ordinance No. 881-77 for the purpose of setting the rates to be charged for electric service by Columbus & Southern Ohio Electric Co. ("C&SOE") to Columbus consumers for the two-year period, June 27, 1977, through June 26, 1979. C&SOE filed with the commission a complaint and appeal from Ordinance No. 881-77, pursuant to R. C. 4909.34. On March 31, 1978, the commission issued its opinion and order in which

rates fixed by the commission were substituted for those in Ordinance No. 881-77.[12] Thus, by the terms of R. C. 4909.39, this rate shall remain in effect "***during the period so fixed by ordinance, which period shall not be less than two years***."

Adding two years on to the effective date of these rates, the ordinance should remain in effect until March 30, 1980. This interpretation is not only buttressed, but mandated, by previous decisions of this court. *State, ex rel. Brainard,* v. *McConnaughey* (1940), 137 Ohio St. 431; *Ohio Edison Co.* v. *Pub. Util. Comm.* (1977), 52 Ohio St. 2d 123. We stated in *Ohio Edison Co.,* at page 126: "In construing the language 'which shall not be less than two years,' this court explained that it meant merely that a Commission order fixing a rate in substitution for that fixed by ordinance would be effective for not less than two years." Further, this has been the interpretation that the commission itself has used. See, *e.g., Re Columbia Gas of Ohio* (July 26, 1978), case No. 78-1008-GA-AIR.

Now, in an apparent turnaround of this long-accepted interpretation, both this court and the commission hold that the R. C. 4909.39 two-year limitation applies only to a municipality's attempt to have utility rates altered and not to a utility company's desire to increase the rates.

At least since 1940, it has been assumed that rates fixed under the terms of R. C. 4909.39 shall remain in effect for at least two years. It has been unquestioned by this court, by the commission, and, most importantly, by the General Assembly. The General Assembly never changed the language in R. C. 4909.39 which would create any impression that the terms of the statute should be limited in the fashion that the majority opinion does. The law, as enacted by the General Assembly and interpreted by this court, has remained constant for years with regard to R. C. 4909.39. There is no clear justification for this court's failure to hold the commission order unlawful, when the order is in direct conflict with the *law* as enacted by the General Assembly and interpreted by this court.

After today's decision, the role of a municipality in the set-

---

[12] We have never explicitly held, nor does the majority opinion in the instant decision, when the two-year period referred to in R. C. 4909.39 begins to run. For the sake of this opinion it will be assumed, *arguendo,* that the period began on March 31, 1978, the day the commission issued its order.

ting of utility rates within its boundaries is diminished, if not completely eradicated. Pursuant to both constitutional and statutory authority, municipalities possess regulatory powers regarding utility rates. See Section 3 of Article XVIII of the Ohio Constitution; R. C. 743.26. Such powers are a matter of the police power, *State, ex rel. Brainard, supra,* and are subject to the limitations placed thereon by the General Assembly in R. C. 4909.34 to 4909.40.

The General Assembly gave municipalities the power to fix utility rates by ordinance. R. C. 4909.34. After such an ordinance is enacted, the usual scenario continues as it did in the instant cause. The utility company will contest the rate and the commission will approve a higher rate than that enacted by ordinance. Subsequently, there is a "hands-off" order imposed upon the municipality. This, allegedly, is intended to diminish the "ploys" of municipalities regarding rate-making. Nevertheless, the utility company can at any time during the two-year period try, and usually be successful, in getting a rate increase. There is no protection from the "ploys" of the utility company and from the unnecessary intrusions by the commission. Certainly, to place the same rules on the utility companies as the municipalities have to conform to will not create the "regulatory inflexibility" with which this court's majority is concerned. Even if that were a real problem, the General Assembly is quite capable of correcting it and the legislative body is better equipped than this court to implement such a charge.

## II.

In numerous recent cases, this court has agreed with the commission that the grant of an allowance for attrition was not proper. See, *e.g., Dayton Power & Light Co.* v. *Pub. Util. Comm.* (1980), 61 Ohio St. 2d 215; *Masury Water Co.* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 147; *C&SOE* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 120; *Franklin Co. Welfare Rights Org.* v. *Pub. Util. Comm.* (1978), 55 Ohio St. 2d 1.

In *Masury Water Co., supra,* at page 151, this court stated: "[T]he commission has demonstrated that in causes such as the present one, where the cost of capital approach is related to the actual or net investment of***[the utility's]

capital structure and is utilized to determine***the 'fair and reasonable' return of book equity, this approach by definition includes a component which represents a realization by investors in the market place that future inflationary pressures may have an adverse effect on the profitability of the enterprise."

Further, this court in *Masury Water,* approvingly quoted the commission's statement that, "The magnitude of such an adjustment would, of course, be difficult to quantify and the record does not provide a proper basis for defining the size of any such adjustment.***[A]djustments of this nature may well serve to diminish the incentive for prudent management and for efficiency in operation."

With a disregard to our past concerns, the majority opinion gives the commission the authority to grant an attrition allowance, even in the absence of evidence to support such a finding since these allowances are "fraught with judgments and assumptions." To grant attrition allowances based on this loose evidentiary standard will invite utility companies to request large amounts for this new rate element. Even if they are granted only a fraction of their requests, they may be able to be compensated for errors caused by their imprudent management.

The evidence that the majority relies on to justify its position is tenuous at best. Indeed, the commission decided the issue against the explicit recommendation of the commission staff. Although the amount granted for an attrition allowance is not substantial here, the estimates propounded by the experts were void of exactitude, as conceded by the majority. On that basis alone, we should refrain from approving this allowance until the estimates are able to be ascertained with more precision and a more clearly defined methodology.

### III.

The majority further holds that the allocation methods used by the commission were reasonable and lawful. The commission based the rate increase on all of the C&SOE's jurisdictional customers, without taking into account any possible differences between Columbus customers and those living outside Columbus' boundaries. For the reasons given in my dis-

sent in *Columbus* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 103, 106, I dissent on this issue. In that case, similar on its facts, involving the same parties as here, decided on a four-to-three basis (one judge concurring in my dissent and another dissenting generally), I wrote as follows:

"I dissent from the majority opinion in the instant cause because the utility company has failed to meet the requisite burden of proof pursuant to R. C. 4909.39 and 4909.15. It is axiomatic that a utility has the burden of proof that the property which is sought to be included in its statutory rate base is used and useful. *Mt. Vernon Telephone Corp.* v. *Pub. Util. Comm.* (1955), 163 Ohio St. 381.

"In the cause *sub judice,* the majority opinion admits that the crux of the commission's adoption of the allocation formula was based upon a 'non-verifiable assumption' that the relationship between the average and peak demands of the city and non-city residents is the same.

"The staff, in its Report of Investigation, recognized that, if the load factor for residential, small and medium general service customers is reasonably equal, then the allocation to Columbus would be acceptable.

"The commission mechanically adopted this 'non-verifiable load factor assumption,' even though individual demand meters could have been used to determine the load factors. Demand meters were not used for the purpose of sampling Columbus customers *vis-a-vis* other Columbus & Southern Ohio Electric Company (C&SOE) customers. Thus, by the use of demand meters, this 'non-verifiable assumption' could easily have been verified.

"It is well known, and should be especially applicable to monopolies which have a fiduciary duty to the public, that the applicant has the burden of proving all the material allegations in the complaint. In *Ohio Motor Freight Tariff Committee, Inc.,* v. *Pub. Util. Comm.* (1959), 169 Ohio St. 172, 177, this court noted the commission's report, which, in pertinent part, stated:

" '***[I]t is elementary that any party complainant before this commission assumes the duty and obligation of proving all of the material allegations contained in his original complaint.***'

"C&SOE had the burden of proof to show that the allocation methodology and resulting valuation were reasonable, but it failed to produce any credible evidence supportive of the method of valuation. The lack of specific cost studies and direct assignments by C&SOE make the reasonableness of the proposed allocation methodology questionable.

"In *Mt. Vernon, supra,* the utility could not prove the valuation of its property because of the lack of reliable depreciation information, and, accordingly, the commission dismissed the rate increase application. This court, at page 389, noted that:

" '***An order by the commission under such circumstances would have required mere conjecture on its part***.'

"Applying the *Mt. Vernon* analysis to the instant cause, the commission should have dismissed the complaint, because it had but a 'mere conjecture' as to the reasonableness of the C&SOE load factor, which was the heart of the application for a rate increase."

For the foregoing reasons, I respectfully dissent from the majority opinion.