OFFICE OF CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as Consumers' Counsel *v.* Pub. Util. Comm. (1983), 6 Ohio St. 3d 377.]

(No. 82-1796—Decided August 31, 1983.)

*Mr. William A. Spratley,* consumers' counsel, *Mr. Richard Ganulin* and *Mr. Michael L. Haase,* for appellant.

*Mr. Anthony J. Celebrezze, Jr.,* attorney general, *Mr. Robert S. Tongren* and *Mr. James R. Bacha,* for appellee.

*Smith & Schnacke Co., L.P.A., Mr. Charles J. Faruki* and *Mr. D. Jeffrey Ireland,* for intervening appellee.

*Per Curiam.* The question presented in this appeal is whether the com-

mission's order authorizing DP&L's accounting modification to reflect post-in-service AFUDC is unreasonable or unlawful.

Simply stated, AFUDC is an accounting mechanism which recognizes capital costs associated with financing construction. Generally, the capital costs recognized by AFUDC include interest charges on borrowed funds and the cost of equity funds used by a utility for purposes of construction.

OCC agrees that for purposes of accounting, the capitalization of AFUDC is proper until the in-service date of an asset. According to OCC, however, after the in-service date of an asset, the capitalization of AFUDC should cease. OCC contends that to hold otherwise would effectively excise the regulatory lag inherent within R.C. Chapter 4909, for which the General Assembly made no specific exception for AFUDC.

In support of this contention, OCC principally relies upon the court's recent decision in *Pike Natural Gas Co.* v. *Pub. Util. Comm.* (1981), 68 Ohio St. 2d 181 [22 O.O.3d 410]. Therein, the Pike Natural Gas Company and the Columbia Gas of Ohio, Inc., sought permission in their respective rate cases to continue to employ an excise tax adjustment clause which would have allowed the utilities to automatically pass-through to consumers any increase in state excise taxes attributable to increased revenues resulting from the purchased gas adjustment clause authorized under R.C. 4905.302.

This court rejected the proposed pass-through, initially noting that the " '* * * Public Utilities Commission is a creature of the General Assembly and [it] may exercise no jurisdiction beyond that conferred by statute.' " *Id.* at 183. (Citations omitted.) Continuing, we examined various provisions of R.C. Title 49, but could find no provisions authorizing excise tax adjustment clauses in addition to the adjustments specifically granted under R.C. 4905.302. Although we recognized an inherent lag which exists within the regulatory process, it was concluded that the resolution of this problem lies with the General Assembly, and not with this court or the commission. *Id.* at 186.

Essentially, OCC contends that the commission's authorization of DP&L's accounting modification contravenes the decision in *Pike, supra,* by summarily dispensing with the regulatory lag existing in R.C. Chapter 4909.

Conversely, appellees argue that *Pike* is wholly distinguishable from the cause *sub judice* on the basis that the utilities' requests therein were made pursuant to the ratemaking provisions of R.C. Chapter 4909, whereas DP&L's request was made pursuant to the accounting provisions of R.C. Chapter 4905. We agree.

The inherent defect in OCC's argument is that it fails to recognize the distinction which exists between accounting practices under R.C. 4905.13 and the ratemaking provisions of R.C. Chapter 4909. The record is clear that DP&L's modification was predicated upon R.C. 4905.13, and not the general ratemaking statutes, *i.e.,* R.C. 4909.15, 4909.05 and 4909.18.

R.C. 4905.13 provides in pertinent part:

"The public utilities commission may establish a system of accounts to be

kept by public utilities * * * and may prescribe the manner in which such accounts shall be kept. * * *"

In *Dayton Power & Light Co.* v. *Pub. Util. Comm.* (1983), 4 Ohio St. 3d 91, 104, this court stated that "* * * we have never held and do not hold today that accounting practice and the ratemaking provisions of the Revised Code are functionally equivalent." This distinction was again recognized in *Consumers' Counsel* v. *Pub. Util. Comm.* (1983), 4 Ohio St. 3d 111, 115, wherein it was concluded that "[s]uch bookkeeping methodology [accounting procedure] is not governed by the ratemaking statutes. * * * Rather, the commission has express statutory authority under R.C. 4905.13 to prescribe the manner in which a utility must keep its books of account."

Of particular importance to the court in *Consumers' Counsel, supra,* was the fact that the accounting modification did not affect the rates paid by consumers. So, too, in the instant case, the commission's order does not affect consumers' rates. This is not to say that the accounting modification will not impact upon DP&L's rate case currently pending before the commission. That issue, however, is not presently before this court for review.

OCC further argues that the capitalization of post-in-service AFUDC and the commission's allowance of construction work in progress ("CWIP"), authorized under R.C. 4909.15(A)(1), will, in effect, allow DP&L a double recovery. In *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108, 112 [12 O.O.3d 115], this court rejected a similar argument stating:

"Appellant argues next that to the extent any CWIP allowance is approved by the commission, there must be an offsetting credit to operating income for funds used during construction (AFUDC).

"Without detailing the accounting principles involved herein, it becomes apparent that were such an entry required by the commission, the net effect would be to neutralize the CWIP inclusion, a result which would render R.C. 4909.15(A)(1) meaningless. Appellant's contention is, therefore, not well taken."

Finally, OCC contends that the commission's order directly conflicts with R.C. 4909.05 (E), which sets forth the concept of "original cost" to be utilized when determining a utility's property valuation for ratemaking purposes under R.C. 4909.15 (A)(1). Again, the subject order has not, at this juncture, affected DP&L's rates since those rates have yet to be determined. Moreover, the question of whether the inclusion of post-in-service AFUDC violates the concept of "original cost" under R.C. 4909.05 (E) must be reserved until the conclusion of DP&L's rate case currently pending before the commission.

For the foregoing reasons, we conclude that the commission's decision authorizing DP&L's accounting modification is reasonable and lawful and, accordingly, the decision is hereby affirmed.

*Order affirmed.*

380

W. BROWN, SWEENEY, HOLMES, C. BROWN and J. P. CELEBREZZE, JJ., concur.

CELEBREZZE, C.J., and LOCHER, J., dissent.

LOCHER, J., dissenting. The majority presents the issue in this case as being merely an exercise in applied accounting principles. Yet, the majority recognizes that DP&L has acknowledged, beginning with its application, that the purpose of this change is to influence *rates:*

"* * * [The] problem is that there is a substantial period of time between the point at which the accrual of AFUDC would historically cease (the commercial operation date of a project) and the point at which *rates* become effective after a *rate case* order which permit[s] revenues to be earned which reflect the project costs as a part of *rate base.* The length of time necessary for the current Ohio *rate case* procedure * * * means that this gap between these two points is normally ten months. This Application will permit DP&L to *close that gap* * * *." (Emphasis added.) Indeed, the Consumers' Counsel has persuasively argued before this court that today's decision will cost consumers $25 million in the next rate case alone.

Likewise, the accounting treatment itself is troublesome. Ohio Adm. Code 4901:1-9-05 states the commission's preference that each electric light company maintain a system of accounts and records as adopted by the Federal Energy Regulatory Commission (formerly known as the Federal Power Commission). 18 C.F.R., Part 101, Electric Plant Instructions 403, 405, Section 3(17) defines "[a]llowance for funds used during construction" as including "* * * the net cost *for the period* of construction of borrowed funds *used for construction purposes* and a reasonable rate on other funds when so used * * *." (Emphasis added.) That same provision of the Code of Federal Regulations also requires that AFUDC *not* include on-line facilities: "Note: When a part only of a plant or project *is placed in operation or is completed and ready for service* but the construction work as a whole is incomplete, that part of the cost of the property placed in operation or ready for service, shall be treated as 'Electric Plant in Service' and allowance for funds used during construction thereon as a charge to construction *shall cease.* Allowance for funds used during construction on that part of the cost of the plant which is *incomplete* may be continued as a charge to construction until such time as it is placed in operation *or is ready for service,* except as limited in item 17, above." (Emphasis added.) *Id.* at 406. See, also, FERC Release AR-5 (effective January 1, 1968).

Therefore, the majority errs by not requiring that the commission remain true to its own regulations. Rather, today's decision will serve the utility's expressed purpose of passing on to consumers costs which the General Assembly has not exempted from the test-year concept.

Accordingly, I would reverse the order of the Public Utilities Commission.

CELEBREZZE, C.J., concurs in the foregoing dissenting opinion.