OFFICE OF CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC
UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *Consumers' Counsel v. Pub. Util.
Comm.* (1992), 63 Ohio St.3d 522.]

(No. 90–2414—Submitted October 22, 1991—Decided May 6, 1992.)

*William A. Spratley,* Consumers' Counsel, *Maureen R. Grady* and *Colleen L. Mooney,* for appellant.

*Lee I. Fisher,* Attorney General, *James B. Gainer* and *Duane W. Luckey,* for appellee.

*Michael R. Beiting, Leila L. Vespoli* and *Kathy J. Kolich,* for intervening appellee, Ohio Edison Co.

---

*Per Curiam.* We have recognized a bifurcated standard of review in appeals from orders of the Public Utilities Commission:

" 'As to questions of fact, this court has repeatedly enunciated the rule that orders of the commission will not be reversed unless they are manifestly against the weight of the evidence or are so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty.  * * * [Citations omitted.]

" 'As to questions of law, however, this court has complete, independent power of review.  Legal issues are accordingly subjected to more intensive examination than are factual questions.' " *Consumers' Counsel v. Pub. Util. Comm.* (1983), 4 Ohio St.3d 111, 112, 4 OBR 358, 359–360, 447 N.E.2d 749, 751, quoting *Consumers' Counsel v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 108, 110, 12 O.O.3d 115, 116, 388 N.E.2d 1370, 1372–1373.

OCC asserts that each of the issues it raises in this appeal turns upon a legal question, requiring application of the latter standard of review.  We disagree and apply the former standard to issues in which questions of fact are determinative.

I

OCC's first four propositions of law relate to the effect of a prior commission accounting order on the rates being set in this proceeding.  The order, issued April 14, 1988 in PUCO No. 88–506–EL–AAM, authorized Ohio Edison to accelerate the amortization of certain tax reserves that the company had

accumulated on its books through the normalization method of accounting. The purpose of the accounting adjustment was to allow the company to delay filing this application to increase rates, which otherwise would have been necessary due to the commencement of operations of Beaver Valley 2 nuclear generating unit. OCC argues that the tax reserves amortized pursuant to the accounting order should be reinstated in this case for amortization against the company's operating expenses, and that the commission's refusal to do so below violated R.C. 4909.15. This statute provides in part:

"(A) The public utilities commission, when fixing and determining just and reasonable rates, fares, tolls, rentals, and charges, shall determine:

" * * *

"(4) The cost to the utility of rendering the public utility service for the test period * * *. Federal, state and local taxes imposed on or measured by net income may, in the discretion of the commission, be computed by the *normalization method* of accounting, provided the utility maintains accounting reserves that reflect differences between taxes actually payable and taxes on a normalized basis, * * * and further provided that such tax benefit as redounds to the utility as a result of such a computation *may not be retained by the company, used to fund any dividend or distribution, or utilized for any purpose other than defrayal of the operating expenses of the utility* and the defrayal of the expenses of the utility in connection with construction work." (Emphasis added.)

Clearly, the statute requires a utility to return the tax reserves at issue to its ratepayers by using them to defray the operating, or construction, expenses of the utility. In its order issued in this rate proceeding, the commission found that the amortization of the reserves pursuant to the previous accounting order defrayed Ohio Edison's operating expenses. OCC argues that, because R.C. 4909.15 is a ratemaking statute, such a defrayal can occur only within the context of a rate proceeding, thus requiring the reinstatement and reamortization of the tax reserves in this case. We see no infirmity in the initial approval of the defrayal in an accounting case as long as the ratemaking effect of that accounting order is reviewed and found appropriate in a rate proceeding. This practice is not unique to this proceeding and finds ample support in precedent.[1] *Consumers' Counsel v. Pub. Util. Comm.* (1983), 6

---

1. The company urges us to find that the commission was *required* to adopt the accounting order for ratemaking purposes in this proceeding. Noting the distinction between accounting and rate orders (*Dayton Power & Light Co. v. Pub. Util. Comm.* [1983], 4 Ohio St.3d 91, 104, 4 OBR 341, 353, 447 N.E.2d 733, 744; *Consumers' Counsel v. Pub. Util. Comm.* [1983], 4 Ohio St.3d 111, 115, 4 OBR 358, 362–363, 447 N.E.2d 749, 754), if we were to adopt the company's

Ohio St.3d 377, 6 OBR 428, 453 N.E.2d 673; *Consumers' Counsel v. Pub. Util. Comm.* (1985), 18 Ohio St.3d 264, 18 OBR 318, 480 N.E.2d 1105. Accordingly, the narrow issue presented is whether the amortization authorized by the previous accounting order defrayed Ohio Edison's operating expenses.

OCC argues that there is no testimony of record to support the commission's finding on this issue and reasons that, absent such testimony, it must be concluded that Ohio Edison "retained" or "distributed" the reserves in violation of R.C. 4909.15(A)(4). While it is true that none of the witnesses explicitly testified that the amortized reserves at issue were used to "defray" the company's operating expenses, the record does reflect that the accounting order permitted the company to delay filing this rate application which, in turn, benefited the company's ratepayers by delaying an increase in their electric rates. Specifically, the evidence shows that, at the time the company filed the accounting case, the commission's staff conducted a study which revealed that the company's revenue requirement would likely have increased by $250 million had it chosen to file a rate application instead. Further, OCC's own witness testified that the rate delay program, of which the accounting change was a part, benefited ratepayers in 1989 and 1990 through lower rates. Based upon evidence that the ratepayers had received a benefit in the form of lower rates, and there being no evidence that the funds were otherwise retained or distributed by the company, we affirm the commission's determination, finding that it is not " 'manifestly against the weight of the evidence' " or " '* * * so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty.' " *Consumers' Counsel (1985), supra.* Accordingly, we affirm the commission's refusal to reinstate the tax reserves in this rate proceeding. In so holding, we agree with the commission that the ratepayers have already benefited by the accounting order's amortization of these funds, and that the reinstatement of the tax reserves in this case would result in a second amortization, improperly conferring this benefit upon ratepayers a second time.

Finally, OCC argues that the commission erred by failing to require Ohio Edison to maintain these tax reserves on its books in the manner prescribed by R.C. 4909.15(A)(4), and by failing to deduct the unamortized balance of the reserves from the rate base, pursuant to R.C. 4909.05(I) and (J). These arguments relate to the appropriate treatment to be given the unamortized balances if the tax reserves were reinstated in this rate proceeding. Because we have upheld the commission's determination that the tax reserves should

---

position, intervenors in rate proceedings would be prohibited from challenging the ratemaking effect accounting orders might have. Therefore, we reject the company's argument.

not be reinstated, they are considered to be fully amortized pursuant to the commission's accounting order. Accordingly, no balance exists for the treatment urged by OCC, making its arguments moot.

## II

Next, OCC contends that the commission erred by classifying certain deferred expenses as working capital, rather than rate base "property." The expenses at issue (deferred operating and maintenance expense, depreciation expense, property tax expense, and interest expense) were associated with the company's share of Perry and Beaver Valley 2 nuclear generating units, and were incurred after the units were constructed and placed in service. The commission authorized the deferral of the expenses through a series of accounting orders that implemented the company's rate delay program, referred to above. The deferred expenses will be amortized over the life of the Perry and Beaver Valley 2, and the company's investors will continue to fund the unamortized balance of the expenses during the period these rates are in effect and well into the future, until fully amortized. In its order, the commission included the unamortized balance in working capital, authorizing a return on the funds which the investors have supplied but not yet recovered. The commission valued the balance at the end-of-test-year level.

R.C. 4909.15(A)(1) provides the basis for the valuation of rate base "property" and working capital:

"(A) The public utilities commission, when fixing and determining just and reasonable rates, fares, tolls, rentals, and charges, shall determine:

"(1) The valuation as of the *date certain of the property of the public utility* used and useful in rendering the public utility service for which rates are to be fixed and determined. The valuation so determined shall be the total value as set forth in division (J) of section 4909.05 of the Revised Code, *and a reasonable allowance for* materials and supplies and *cash working capital, as determined by the public utilities commission.*" (Emphasis added.)

The valuation determined by R.C. 4909.05(J) includes the property defined in R.C. 4909.05(E), which includes:

"The original cost of all other kinds and classes of property used and useful in the rendition of service to the public. Such original costs of property, other than land owned in fee, shall be the cost, as determined to be reasonable by the commission, to the person that first dedicated the property to the public use and shall be set forth in property accounts and subaccounts as prescribed by the commission."

In arguing that the deferred expenses are "property" subject to date certain valuation, OCC relies on *Consumers' Counsel v. Pub. Util. Comm.* (1985), 18 Ohio St.3d 264, 18 OBR 318, 480 N.E.2d 1105. At issue there was the propriety of the commission's inclusion in the rate base of a post in-service allowance for funds used during construction ("AFUDC").[2] This court upheld the commission's inclusion of such funds, citing the discretion given the commission in R.C. 4909.05(E) to determine the original cost of a utility's property. The AFUDC at issue there clearly fell within the purview of R.C. 4909.05(E) because it was a component of the cost to construct physical plant. In the case before us, however, the deferred expenses are not related to the original cost of property, but represent the operation and maintenance costs of the plant once constructed and in service. We find that the deferred expenses at issue do not fall within the "property" contemplated by R.C. 4909.05(E), and reject OCC's contention that division (E) is controlling.

OCC next argues that the deferred expenses do not fall within the meaning of "cash working capital," as urged by the commission and the company.[3] In making its argument, OCC relies upon *Consumers' Counsel v. Pub. Util. Comm.* (1987), 32 Ohio St.3d 263, 265, 513 N.E.2d 243, 246, and *Columbus v. Pub. Util. Comm.* (1984), 10 Ohio St.3d 23, 24, 10 OBR 175, 176, 460 N.E.2d 1117, 1119, wherein this court stated that the "theory behind a working capital allowance is the recognition that a utility company must have additional investments in inventories of materials and supplies, and *a certain amount of cash in order to sufficiently operate as a business.*" (Emphasis added.) OCC asserts that, under these cases, the definition of cash working capital is limited to those investor-supplied funds which are permanent and necessary for the utility's *ongoing* operations. It reasons that the deferred expenses at issue are nonrecurring and extraordinary and, therefore, do not constitute cash working capital. The record establishes otherwise. The deferred expenses are being amortized over the life of Perry and Beaver Valley 2 and, as such, investors will continue to supply funds to carry the balance well into the future until the amortization is complete.

---

2. " '* * * AFUDC is an accounting mechanism which recognizes capital costs associated with financing construction. Generally, the capital costs recognized by AFUDC include interest charges on borrowed funds and the cost of equity funds used by a utility for purposes of construction.' " *Consumers' Counsel*, 18 Ohio St.3d at 264, 18 OBR at 319, 480 N.E.2d at 1106, quoting *Consumers' Counsel v. Pub. Util. Comm.* (1983), 6 Ohio St.3d 377, 378, 6 OBR 428, 429, 453 N.E.2d 673, 674. Post in-service AFUDC is for the funds necessary to cover the interest which comes due on the borrowed construction funds after the plant is constructed and placed in service, but before these funds can be recovered through a rate proceeding.

3. R.C. Chapter 4909 defines neither "working capital" nor "cash working capital."

Further, in *Consumers' Counsel v. Pub. Util. Comm.* (1986), 25 Ohio St.3d 213, 216–217, 25 OBR 275, 277–278, 495 N.E.2d 930, 933, we upheld the commission's inclusion of depreciation, deferred taxes, deferred investment tax credits, and return on common equity in the calculation of cash working capital. There, we noted the commission's reasoning that cash working capital " 'merely recognizes a timing difference between the booking and the collection of an expense,' " *id.* at fn. 2, and agreed that the underlying requirement for items to be included in working capital is that "investors at one time provided cash, which is recovered over time from rate payers."[4] *Id.* at 216, 25 OBR at 277, 495 N.E.2d at 933. In the case *sub judice*, Ohio Edison's investors indisputably provided cash for these deferred expenses, which the company will recover over the life of the underlying property. Because the deferred expenses at issue fall within the generally accepted definition of working capital, their classification as such was not unreasonable or unlawful, and the commission's determination on this issue is affirmed.

In the alternative, OCC argues that, even if the deferred expenses were properly classified as working capital, R.C. 4909.15(A)(1) requires that working capital be valued as of the date certain rather than as of the end of the test year. We do not agree. In *Consumers' Counsel v. Pub. Util. Comm.* (1987), 32 Ohio St.3d 263, 265, 513 N.E.2d 243, 246, we stated:

"By omitting a specific formula in R.C. 4909.15(A)(1), the General Assembly has vested the PUCO with broad discretion in determining the appropriate allowances for working capital in utility rate cases. We believe that such determinations are lawfully within the expertise of the PUCO unless they are manifestly against the weight of the evidence and so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. See *Consumers' Counsel v. Pub. Util. Comm.* (1980), 64 Ohio St.2d 71, 18 O.O.3d 302, 413 N.E.2d 799; *Columbus v. Pub. Util. Comm.* (1984), 10 Ohio St.3d 23, 10 OBR 175, 460 N.E.2d 1117."

The record shows that the balance of the deferred expenses at issue increased each month throughout the test year, and that the end-of-test-year level adopted by the commission is representative of the company's working capital needs during the period in which these rates will be in effect. In accordance with the standard articulated in *Consumers' Counsel (1980)*, *supra*, we find that the commission's determination was sufficiently sup-

---

4. This language is in accord with the commission's generally recognized definition of cash working capital as "the average amount of capital provided by investors for items other than plant and other specified rate base items, to provide funds between the time the expenditure is made and the time monies are collected for that expenditure." *Columbia Gas of Ohio, Inc.* (Apr. 5, 1990), PUCO Nos. 89–616–GA–AIR *et seq.*, at 4, 113 PUR 4th 1, 15.

ported by the record and was well within its lawful discretion. Accordingly, OCC's alternative proposition of law is overruled.

## III

R.C. 4905.70 requires the commission to "establish criteria for the investigation, identification, and remedy of the existence of any excess capacity * * * in the generating systems of electric light companies." Pursuant to this mandate, the commission adopted an excess capacity policy statement, which generally defines "excess capacity" as the amount of capacity which exceeds peak load plus an appropriate reserve margin. The policy establishes a "generic benchmark" for reserve capacity at twenty percent. Reserve margins greater than twenty percent are presumed to be excessive; however, this presumption may be rebutted with a showing that greater margins "confer a positive net present benefit to the ratepayer or are justified by unique system characteristics." The policy further provides that, if excess capacity is found to exist, the commission will determine the appropriate remedy on a case-by-case basis.

In this proceeding, the commission determined Ohio Edison's reserve margin to be 22.84 percent for the test year. The projected reserve margins were 22.34 percent for 1990, 20.98 percent for 1991, 17.75 percent for 1992, 19.24 percent for 1993, and 17.14 percent for 1994. Although the commission found that the 20 percent benchmark should be applied to Ohio Edison, it also found that Ohio Edison's reserve margin was not excessive and that no adjustment to the company's revenue requirement should be made. The primary basis for the commission's determination was the extremely small deviation of the reserve margin above the benchmark during the test year, and the reserve margin's decline to below twenty percent after 1991. The commission's determination not to adjust the company's revenue requirement also took into consideration several other factors: "First, * * * capacity used for state and federal experimental programs confers a benefit to the ratepayer in the long run. Second, system planning is necessarily done on a corporate basis, which includes Penn Power. The total system reserves are lower and are projected to fall in the 1990s. Third, 'acid rain' legislation is very likely to reduce available physical and economic generating capacity in the near future. Finally, the capacity sold to PEPCO has reduced the reserve margin and also confers a benefit to the ratepayer."

OCC's appeal on this issue is based upon the apparent inconsistency of the commission's finding the twenty percent benchmark appropriate for Ohio Edison, and then finding that the test year reserve margin of 22.84 percent does not constitute "excess capacity." OCC reasons that, if the twenty

percent reserve margin is appropriate, then any capacity over that amount is not "useful" in providing service to the company's ratepayers and should be excluded from rate base, pursuant to R.C. 4909.15(A)(1).

In *Consumers' Counsel v. Pub. Util. Comm.* (1981), 67 Ohio St.2d 153, 158, 21 O.O.3d 96, 99–100, 423 N.E.2d 820, 824, we noted the wide discretion that should be given the commission in determining excess capacity issues. We stated:

" * * * To paraphrase what we stated [relative to rate of return] in *Consumers' Counsel v. Pub. Util. Comm.* (1980), 64 Ohio St.2d 71, 79 [18 O.O.3d 302, 307, 413 N.E.2d 799, 804]: Limited judicial review of an excess capacity determination is sound for the reason that while excess capacity analyses have an aura of precision about them, they are fraught with judgments and assumptions. * * * "

In *Cleveland v. Pub. Util. Comm.* (1980), 63 Ohio St.2d 62, 65, 17 O.O.3d 37, 40, 406 N.E.2d 1370, 1374, we found that a reserve margin, even though over twenty percent, did not constitute excess capacity, noting that "[s]ince utilities must anticipate load growth years in advance to maintain adequate capacity to ensure reliable service, it is unrealistic to expect a utility to have only the precise amount of capacity needed at any given time."

We find the commission's determination on this issue to be well within the discretion afforded it under the above cases. In so holding, we note that the twenty percent reserve margin employed by the commission is but a benchmark, which should not be given mechanical application to a subject which, by its very nature, is imprecise. The commission's determination merely gives recognition to this inherent imprecision and is affirmed.[5]

*Order affirmed.*

MOYER, C.J., SWEENEY, HOLMES, DOUGLAS, WRIGHT, H. BROWN and RESNICK, JJ., concur.

---

5. In affirming the commission on this factual question, we need not address the legal issue as to whether the commission is required, pursuant to R.C. 4909.15(A)(1), to make an adjustment for excess capacity, if it is found to exist.