CITY OF CLEVELAND, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.
CITIES OF AKRON, CANTON AND CUYAHOGA FALLS, OHIO, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

(Nos. 81-1792 and 81-1817—Decided June 30, 1982.)

*Mr. Richard M. Fanelly,* for appellant cities of Akron, Canton and Cuyahoga Falls.

*Mr. James E. Young,* director of law, *Mr. James L. Harkins, Jr.* and *Mr. Craig A. Glazer,* for appellant city of Cleveland.

*Mr. William J. Brown,* attorney general, *Mr. Marvin I. Resnik* and *Mr. Harris S. Leven,* for appellee.

*Messrs. Jones, Day, Reavis & Pogue, Mr. Paul T. Ruxin, Mr. Richard D. Avil, Jr.,* and *Mr. Charles M. Kennedy,* for intervening appellee.

*Per Curiam.* Ohio Adm. Code 4901: 1-18-04 provides, in part:

"(B) The company shall provide an optional uniform payment plan (budget plan) on an annual basis for any customer who is not in default on a previously agreed upon extended payment plan. Arrearages need not be included in the optional uniform payment plan (budget plan)."

Pursuant to the mandate established by the foregoing administrative rule, East Ohio has adopted a budget billing program for optional use by its residential customers. Under East Ohio's budget billing program, residential space heating customers are given the option of paying their annual gas bills, as estimated in July, the start of the budget year, in equal monthly installments. At the end of the 12 months, a reconciliation is made to adjust any difference between the budget amounts paid over the year and the actual charges for gas consumed.

Because the budget year used in administering this program commences in July, and the primary heating season occurs during the winter months, customer payments during the early months (July through approximately November) tend to exceed the actual bills for service that budget customers would otherwise be required to pay during those early months. As a matter of accounting practice, East Ohio carries the excess payments made during these early months as credits to its customers' accounts. In later months, when charges for gas consumption exceed the monthly budget payment, the excess charges are debited to the customers' account balances, reducing available credits. At some point in the budget year, customer credit balances are usually exhausted, but monthly charges for gas consumption continue to exceed monthly budget payments. As a result, debit balances arise which East Ohio must finance, usually through short term borrowing, until budget payments in the spring again exceed actual charges and are applied to reduce or eliminate the debits. In the final

month of each budget year, any over or under-collection is adjusted through a refund or credit to the customer or a settle-up payment to the company.

The parties to this appeal disagree as to the proper consideration which should be given the budget billing program in the rate-making process. Specifically the parties disagree as to whether the yearly average of budget billing balances held by East Ohio should be offset against the company's working capital allowance.[1]

The parties disagree as to whether, when averaged over the course of a year, the net balance of the budget billing accounts results in a positive or negative figure. The appellant cities contend that the average budget billing balance is a positive figure representing consumer-provided funds which the utility has available for investment or other working capital needs. They contend that this calculated amount can be analogized to customer deposits which this court has held must be offset against the utility's working capital allowance. *Cincinnati* v. *Pub. Util. Comm.* (1954), 161 Ohio St. 395; *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108, 115. East Ohio, on the other hand, contends that when properly calculated, the average budget billing balance is a negative figure and that the budget billing program over the course of a year results in a working capital requirement in excess of $2.2 million. East Ohio emphasizes that during a portion of the budget year cycle, *i.e.,* during the late winter and early spring, the company must, in effect, finance many of its budget customers' gas purchases.

The commission found it unnecessary to determine the correct average budget billing balance or the correct means of calculating such a balance. Rather, the commission held that budget billing balances are distinguishable from customer deposits, income tax accruals and other customer-supplied funds held by the company which have been held to be working

---

[1] In fixing rates, the Public Utilities Commission is commanded to determine the valuation of the utility to which an appropriate rate of return can be applied. R. C. 4909.15(A)(3). This valuation includes "a reasonable allowance for materials and supplies and cash working capital," R. C. 4909.15(A)(1). As pointed out in *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108, at 114, applying an offset to the working capital allowance has the same ultimate effect on the ratemaking process as does deducting the amount of the offset directly from the rate base.

capital allowance offsets. The commission looked to the unique cyclical nature of the budget billing program, and determined that in no other company account used in the calculation of the working capital allowance did the balance shift from a positive during one part of the year to a negative during other parts of the year. The commission in its entry on rehearing stated:

"[I]t is the cycle from positive to negative which distinguishes the budget billing balance. Though the balance in the tax account may be reduced to zero, there is not a shift from positive to negative in that or any other account which is recognized in the calculation of the working capital allowance. It is true that in making that calculation, we use various averaging methods to arrive at a reasonable estimate of the funds which are necessary or available throughout the entire year. It does not follow, however, that we can average the positive and negative balances associated with budget billing to arrive at some number which is logical to use as a working capital offset."

The scope of our review of commission orders was aptly described in *Consumers' Counsel* v. *Pub. Util. Comm., supra,* at page 110:

"Pursuant to R. C. 4903.13, the Supreme Court is required to reverse, vacate or modify final orders of the Public Utilities Commission only where, upon a consideration of the record, the order is unreasonable or unlawful. In ascertaining the reasonableness and lawfulness of commission orders, this court's scope of review has traditionally turned on whether an issue appealed from presents a question of law or one of fact.

"As to questions of fact, this court has repeatedly enunciated the rule that orders of the commission will not be reversed unless they are manifestly against the weight of the evidence or are so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty. * * *

"As to questions of law, however, this court has complete, independent power of review. Legal issues are accordingly subject to more intensive examination than are factual questions. But, this does not prevent the court from acknowledging and, in certain instances, utilizing the specialized expertise of an agency in interpreting the law. These situations arise

where there exists disparate competence between the respective tribunals in dealing with highly specialized issues and where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly."

The dispute in the instant case represents the type of highly specialized issue referred to in the foregoing passage which can benefit from the commission's expertise. We do not believe that the commission acted unreasonably or unlawfully in recognizing the dissimilarities between budget billing accounts and customer contributions in the form of tax accruals or customer deposits.

In both *Cincinnati* v. *Pub. Util. Comm.*, *supra*, and *Cleveland Elec. Illuminating Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403, this court recognized that tax accruals and customer deposits are generally constant with reasonable certainty and available for investment in materials and supplies.[2] However, as the commission recognized, the budget billing program, although providing capital during a portion of the season which can be used by the company, is unique in the fact that during other periods, the program actually provides a drain on working capital. In light of the unique nature of the program this court does not find that the commission acted unlawfully or unreasonably in failing to specifically calculate an average budget billing balance and to offset that balance against the working capital allowance. The commission's order is therefore affirmed.

*Order affirmed.*

CELEBREZZE, C. J., SWEENEY, HOLMES and KRUPANSKY, JJ., concur.

W. BROWN, VICTOR and BROGAN, JJ., dissent.

VICTOR, J., of the Ninth Appellate District, sitting for LOCHER, J.

BROGAN, J., of the Second Appellate District, sitting for C. BROWN, J.

BROGAN, J., dissenting. I must respectfully dissent. I agree with my colleagues that this review of the commission's

---

[2] See, also, *Consumers' Counsel* v. *Pub. Util. Comm., supra,* at footnote 2.

action is upon a question of law. Legal questions are subject to more intensive examination than are factual questions.

This court has on three previous occasions addressed the propriety of offsetting customers' contributions in the form of accruals from a utility's working capital allowance. *Cincinnati* v. *Pub. Util. Comm.* (1954), 161 Ohio St. 395; *Cleveland Electric Illuminating Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403; *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108. Appellants argue these three cases require any positive balance produced by the budget billing program to be offset.

In the hallmark case of *Cincinnati* v. *Pub. Util. Comm.*, *supra*, this court, in paragraph five of the syllabus, stated:

"In fixing telephone rates, customers' contributions in the form of accruals for the payment of taxes, deposits to secure the payment of customers' bills for service or as advances on installment charges, and collections of rents to be paid at future dates, which will be constant with reasonable certainty in the foreseeable future and which are available for investments in materials and supplies, or for use as working capital, should be used as an offset on the allowance for working capital * * *."

In *Cleveland Elec. Illuminating Co.* v. *Pub. Util. Comm.*, *supra*, this court reaffirmed the working capital allowance offset enunciated in *Cincinnati*, stating:

"The record shows that there were some accruals for federal income tax payments and that the evidence as to the amount was conflicting. There is nothing in the record to support a conclusion that these accruals were not available due to their payment 'on a relatively current basis.' Since there were some federal income tax accruals and the Commission made no allowance for them in the formula used for determining working capital requirements, it follows that the Commission failed to properly apply the holding in *Cincinnati* v. *Pub. Util. Comm.*, * * * in computing the allowance for working capital." *Id.* at 425-426.

Finally, the issue of offsetting working capital with customers' deposits was addressed in *Consumers' Counsel* v. *Pub. Util. Comm.*, *supra*. This case was decided subsequent to

enactment of R. C. 4909.05(I) and (J). R. C. 4909.05(J) provides, in relevant part:

"The valuation of the property of the company shall be the sum of the amounts contained in the report pursuant to divisions (C), (D), (E), (F), and (G) of this section, less the sum of the amounts contained in the report pursuant to divisions (H) and (I) of this section."

R. C. 4909.05(I) provides:

"Any sums of money or property that the company may have received as total or partial defrayal of the costs of its property."

In *Consumers' Counsel, supra,* the commission was of the belief that consumer deposits were not included under the language of R. C. 4909.05(I) and, therefore, they were not subject to an offset pursuant to R. C. 4909.05(J). This court neither accepted nor rejected that contention. Instead, the court stated:

"* * * *Cincinnati* v. *Pub. Util. Comm.* * * * governs the issue * * *. *The rationale for an offset,* as expressed in that decision, and as recognized by the commission in the context of R. C. 4909.05(I) deductions, *is to permit investors to earn a return only on that property for which they have supplied funds, not on funds contributed by customers.* The record indicates that customer deposits are relatively constant and available for investment or use as working capital. Accordingly, we find that the commission acted improperly in failing to offset working capital by customer deposits." (Emphasis added.) *Id.* at 115.

Significantly, the court held that "* * * the formula approach to rate base calculations as used by the commission * * * need [not] be rejected. We only require that due account be taken of customer deposits. If the formula is not designed to accommodate an offset to working capital, * * * then it may be necessary to deduct customer deposits directly from the rate base. The result would be the same." *Id.*

Appellants stress that the underlying principle governing this case is that "* * * investors [are entitled] to earn a return only on that property for which they have supplied funds, not on funds contributed by customers." *Id.* Additionally, the city of Cleveland notes that it is not necessary for the complaining

party to actually trace the use of customer supplied funds. It is only necessary to show that the funds were available for use by the utility. *Id.* at 115, fn. 3.

Appellants argue that the record demonstrates customer budget billing funds were available for use by EOG and, in fact, were used. Appellants illustrate this assertion by pointing to the testimony of A. Scott Rothey, who testified on behalf of Cleveland, as follows:

"* * * There is no doubt that the company's short term borrowings would increase substantially during the summer months were it not for the availability of these budget billing balances." Additionally, Rothey stated that "[t]he company is provided significant amounts of working capital in the form of advance payments from its budget billing customers. In an economic sense, they have the same characteristics as any customer deposit."

EOG witness Timothy J. Long responded to a question raised by appellant Cleveland in the following manner:

"Q.: * * * [D]on't those billing deposits come at a time which is particularly opportune to the company insofar as the financing of its current gas storage program is concerned?

"A.: The pattern of those balances do match, yes."

Moreover, appellant cities point to EOG's Schedule 3, where a summary of budget account balances for the period dating from July 1979 through February 1981, is contained. The schedule indicates that cumulative monthly balances for this period totaled $114,728,123, while debits equaled $38,956,532, producing a positive yearly figure of $75,771,591 which, when divided by 12 equates to an average monthly positive figure of $6,314,299. Appellants contend that a positive figure has been available to EOG for purposes of working capital.

In fact, the commission in its initial opinion and order denied the offset, even assuming "an average positive balance," on the basis of lack of constancy. On rehearing, the commission denied the offset on the basis that the budget billing account temporarily dipped below a zero balance, unlike tax accounts which shift from a positive figure to a zero balance.

Finally, appellants contend that the commission's reason-

ing for the denial of a capital offset, on the basis that EOG's budget account temporarily achieves a negative balance is, at best, unsound. Appellants note that in this same rate case, offsets against working capital were factored against EOG tax accounts, which four times annually reach a zero balance. Appellants contend that according to the commission's decision, even a minute negative balance in one month would negate any offset for tax accruals, even though the negative balance is substantially outweighed by positive balances in the other 11 months of the yearly cycle. Appellants contend this test is unreasonable and unlawful, and submit that positive and negative balances should be netted to determine whether any benefit or detriment can be attributed to EOG from its budget program. I agree.

The order of the commission should be reversed and remanded for further proceedings to determine the positive balance associated with the budget billing program and, if necessary, to offset any such amount against working capital.

W. BROWN and VICTOR, JJ., concur in the foregoing dissenting opinion.