OFFICE OF CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.
[Cite as Consumers' Counsel *v.* Pub. Util. Comm. (1986), 25 Ohio St. 3d 213.]

(No. 85-1021—Decided August 6, 1986.)

214

*William A. Spratley,* consumers' counsel, *Beth Ann Burns* and *Richard P. Rosenberry,* for appellant.

*Anthony J. Celebrezze, Jr.,* attorney general, *Robert S. Tongren, John L. Shailer* and *Duane W. Luckey,* for appellee.

*Squire, Sanders & Dempsey, Alan P. Buchmann, Arthur E. Korkosz, Charles R. McElwee II, Alan D. Wright* and *Craig I. Smith,* for intervening appellee.

*Per Curiam.* In this appeal OCC challenges the PUCO's determination of CEI's cash working capital allowance.

The scope of this court's review of PUCO's orders is set forth in R.C. 4903.13 which states in pertinent part:

"A final order made by the public utilities commission shall be reversed, vacated, or modified by the supreme court on appeal, if, upon consideration of the record, such court is of the opinion that such order was unlawful or unreasonable."

"Under the 'unlawful or unreasonable' standard, this court will not reverse or modify an order of the commission 'where the record contains sufficient probative evidence to show that the commission's determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty.' " *Consumers' Counsel* v. *Pub. Util. Comm.* (1985), 18 Ohio St. 3d 264, 265; *Cleveland* v. *Pub. Util. Comm.* (1982), 70 Ohio St. 2d 290, 293 [24 O.O.3d 370]; *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 303, 305 [21 O.O.3d 191]; *Columbus* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 103, 104 [12 O.O.3d 112]. See, also, *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108, 110 [12 O.O.3d 115]; *Ohio Utilities Co.* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 153, 164 [12 O.O.3d 167]; *Duff* v. *Pub. Util. Comm.* (1978), 56 Ohio St. 2d 367, 370 [10 O.O.3d 493]; *General Motors Corp.* v. *Pub. Util. Comm.* (1976), 47 Ohio St. 2d 58 [1 O.O.3d 35], paragraph two of the syllabus; *Cleveland Elec. Illum. Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403 [71 O.O.2d 393], paragraph eight of the syllabus. We assess OCC's challenge with this standard of review in mind.

The first question we will address is whether the PUCO must perform a lead-lag study in order to determine an appropriate cash working capital allowance. R.C. 4909.15(A)(1) established the rate base for utility ratemaking purposes and, at the time relevant herein, stated in pertinent part:

"(A) The public utilities commission, when fixing and determining just and reasonable rates, fares, tolls, rentals, and charges shall determine:

"(1) The valuation as of the date certain of the property of the public utility used and useful in rendering the public utility service for which rates are to be fixed and determined. The valuation so determined shall be the total value as set forth in division (J) of section 4909.05 of the Revised Code, *and a reasonable allowance for* materials and supplies and *cash working capital,* as determined by the public utilities commission. The commission may, in its discretion, permit a reasonable allowance for construction work in progress but, in no event, may any allowance for construction work in progress be made by the commission until it has determined, after a physical inspection, that the particular construction project is at least seventy-five per cent complete." (Emphasis added.)

The statute does not constrain the PUCO to any particular methodology for determining cash working capital nor does it limit the PUCO to any particular type or form of evidence. The PUCO is granted the discretion to determine the best method for arriving at a "reasonable" allowance. This court in *Columbus* v. *Pub. Util. Comm.* (1984), 10 Ohio St.

3d 23, 24-25, affirmed the PUCO's use of the formula approach over a lead-lag study and stated:

"It is conceded by the parties hereto that a lead-lag study would produce the most accurate estimate of a utility's requirement for working capital. However, lead-lag studies are expensive to conduct. The commission has therefore selected a formula approach which it believes to be a reliable approximation of a utility's working capital requirements. We have also recognized and approved the formula approach as a reliable instrument used by the commission. See *Columbus* v. *Pub. Util. Comm.* (1950), 154 Ohio St. 107 [42 O.O. 186].

"Furthermore, by omitting a specific formula in R.C. 4909.15(A)(1), the General Assembly has vested the commission with broad discretion in determining the appropriate allowance for working capital. We believe that such determination is lawfully within the expertise of the commission unless it is manifestly against the weight of the evidence and so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. See *Consumers' Counsel* v. *Pub. Util. Comm.* (1980), 64 Ohio St. 2d 71, 79 [18 O.O.3d 302]; *Cleveland* v. *Pub. Util. Comm.* (1982), 70 Ohio St. 2d 290, 293 [24 O.O.3d 370]."

In the instant case the PUCO used a formula to arrive at an allowance for cash working capital of approximately $9.9 million. The lead-lag study used to test the validity of that formula has failed to demonstrate that the PUCO's determination was manifestly against the weight of the evidence. We are not persuaded that lead-lag studies are necessarily more accurate and should be required to determine cash working capital. Quite the contrary, the facts and arguments presented to this court have led us to the conclusion that lead-lag studies can be performed in different ways for different purposes and can yield a variety of results. For this reason we again decline to limit the discretion of the PUCO and will not require the use of a lead-lag study in place of a formula to determine cash working capital.

The next question is whether the PUCO's inclusion of depreciation, deferred taxes, deferred investment tax credits and return on common equity in the lead-lag study performed in this case was unlawful or unreasonable. Although these four items are not generally thought of as involving cash outlay, they reflect the fact that investors at one time provided cash, which is recovered over time from rate payers.[2] The PUCO,

---

[2] The PUCO explained as follows in its opinion and order:

"When a piece of property (other than land) is placed into service, the investment in that property is charged to the appropriate plant account and eventually becomes a part of the rate base. Customers are charged a depreciation expense each month on that property so that the investment in the property will eventually be returned to investors over the useful life of the property. Each month, depreciation expense is recorded on the company's books. The accumulation of those depreciation expenses or the reserve for depreciation is deducted from rate base in a rate case because it represents in theory the amount of the investment already returned to the investor. However, at any given point in time, such as the date certain, the balance of the depreciation reserve always includes approximately 42 days' worth of

thus, reasons that it obtains the most accurate reflection of its day-to-day working capital requirement by including depreciation, deferred taxes, deferred investment tax credit and return on common equity in its formula for determining cash working capital. The PUCO has reiterated this rationale in its subsequent decisions in *Re Ohio Edison Co.* (Oct 29, 1985), No. 84-1359-EL-AIR, and *Re Ohio Bell Telephone Co.* (Dec. 10, 1985), No. 84-1435-TP-AIR.

Appellant's reliance on the dicta from the PUCO's decision in *Re Dayton Power & Light Co.* (Aug 7, 1984), No. 83-777-GA-AIR is misplaced. The *Dayton Power* case did suggest that the four items in question should not be included in a lead-lag study if that study were to be used as the method for determining cash working capital. In *Dayton Power,* however, the PUCO rejected the use of lead-lag studies in favor of a formula approach. Keeping in mind that lead-lag studies can be performed in a number of ways for a number of purposes, it is not necessarily contradictory for the PUCO to have advocated the exclusion of the four items in the lead-lag study discussed in *Dayton Power* and the inclusion of those same items in the lead-lag study in the instant case.

In conclusion, OCC has not demonstrated that the PUCO's inclusion of the four items in question in the lead-lag study used to test the validity of the formula for computation of cash working capital was contrary to law. The PUCO's order is, therefore, affirmed.

*Order affirmed.*

CELEBREZZE, C.J., SWEENEY, LOCHER, HOLMES, C. BROWN, DOUGLAS and WRIGHT, JJ., concur.

---

uncollected provision for depreciation expense. In other words, because of the revenue lag there is always about a month and a half difference between the time the rate base is reduced (when the expense is recorded) and the time that expense is recovered through the collection of revenues. This same concept is equally applicable to deferred income taxes and deferred ITC [income tax credits]. This does not constitute an attempt to track the exact level of recovery of a certain expense, but rather merely recognizes a timing difference between the booking and the collection of an expense. To exclude these items from the lead/lag study would be to distort the revenue lag. It is clear that the financing of the cost of service to customers, not just current cash expenditures, must be recognized in working capital.

"With respect to the return on equity, OCC witness Brosch takes issue with the assumption that common shareholders expect a return on their investment daily. He felt that if the return on equity were to be included in the lead/lag study, that the rate of return ought to be adjusted downward. Staff witness Hensel pointed out that the earnings of the company are effectively reinvested as additional common equity, as earned, pending any payment for dividends. Further, it would be one-sided to include the lead in payments of interest and preferred dividends in the study and not the lag associated with the return on equity. *See also Duke Power Co.,* 49 P.U.R. 4th 483, at 510. We do not believe that the rate of return must be adjusted in this case merely because in testing the assumptions contained in the formula approach to working capital we find it necessary to recognize the revenue lag associated with common equity." (References to exhibits omitted.)