OFFICE OF CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES. (TWO CASES.)

[Cite as Consumers' Counsel *v.* Pub. Util. Comm. (1987), 32 Ohio St. 3d 263.]

(Nos. 86-270 and 86-525—Decided September 2, 1987.)

*William A. Spratley,* consumers' counsel, *Bruce J. Weston, Evelyn R. Robinson, Michael P. Cotleur* and *G. James Van Heyde,* for appellant.

*Anthony J. Celebrezze, Jr.,* attorney general, *Robert S. Tongren, Ann E. Henkener* and *James B. Gainer,* for appellee.

*Mark H. Longnecker, Jr.,* and *Gary A. Garfield,* for intervening appellee, Cincinnati Bell Telephone Co.

*Donald W. Morrison* and *Kevin M. Sullivan,* for intervening appellee, Ohio Bell Telephone Co.

*Per Curiam.* The issues raised and propositions presented by the OCC in these cases are essentially identical. The OCC submits that the Cincinnati Bell order and the Ohio Bell order are unlawful and unreasonable in the following respects:

(1) the PUCO erred by failing to authorize negative working capital allowances as an offset to the companies' rate bases;

(2) as an alternative to the first proposition, the PUCO erred by failing to deduct the customer-provided, negative working capital from the companies' rate bases as separate deductions;

(3) the PUCO erred by failing to exclude non-cash items from the calculations of the companies' cash working capital allowances;

(4) the PUCO erred by failing to exclude interstate revenues from the calculations of the companies' cash working capital allowances;

(5) the PUCO erred by failing to properly deduct customer-provided advancements for excise taxes from the calculations of the companies' cash working capital allowances; and

(6) the PUCO erred by failing to order Cincinnati Bell to cease its practice of billing its customers in advance of rendering service.

Before addressing the issues raised by these appeals, we first note the well-established criteria for the review of PUCO orders: "A finding and order by the Public Utilities Commission will not be disturbed unless it appears from the record that such finding and order are manifestly against the weight of the evidence and are so clearly unsupported by the record as to show misapprehension or mistake or willful disregard of duty." *C&SOE* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 120, 12 O.O. 3d 112, 388 N.E. 2d 1378, syllabus.

This standard particularly applies to questions of fact. *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108, 12 O.O. 3d 115, 388 N.E. 2d 1370. This court does not substitute its own opinion for that of the Public Utilities Commission on questions of fact. *Pennsylvania Rd. Co.* v. *Pub. Util. Comm.* (1933), 126 Ohio St. 260, 185 N.E. 49; *Consumers' Counsel* v. *Pub. Util. Comm.* (1983), 4 Ohio St. 3d 111, 4 OBR 358, 447 N.E. 2d 749. As to questions of law, how-

ever, this court has complete, independent power of review. Legal issues are accordingly subject to more intensive examination than are factual questions. *Consumers' Counsel* v. *Pub. Util. Comm., supra* (58 Ohio St. 2d), at 110, 12 O.O. 3d at 116, 388 N.E. 2d at 1373.

I

With the exception of the OCC's final proposition of law, the issues raised in these cases relate to the PUCO's determinations of the cash working capital allowances and rate base valuations in the Cincinnati Bell and Ohio Bell orders. The OCC argues that the PUCO's orders unreasonably inflated the companies' rate bases (and ultimately the rate increases granted by the PUCO).

A

The OCC's first and second propositions of law urge that the PUCO erred by failing to properly account for the companies' negative working capital requirements. The OCC contends that the PUCO should have either (1) authorized negative working capital allowances, or (2) deducted customer-supplied negative working capital from the companies' rate-base valuations.

R.C. 4909.15(A)(1) provides:

"(A) The public utilities commission, when fixing and determining just and reasonable rates, fares, tolls, rentals, and charges, shall determine:

"(1) The valuation as of the date certain of the property of the public utility used and useful in rendering the public utility service for which rates are to be fixed and determined. The valuation so determined shall be the total value as set forth in division (J) [formerly (K)] of section 4909.05 of the Revised Code, *and a reasonable allowance for materials and supplies and cash working capital, as determined by the public utilities commission. * * *"* (Emphasis added.)

R.C. 4909.05(J), formerly (K), provides that the valuation of a utility's property is the sum of the original cost or acquisition cost of the company's land and other property, less the proper depreciation reserve as determined by the PUCO, and less the sum of the amounts determined by the PUCO pursuant to division (I), formerly (J), of R.C. 4909.05.

R.C. 4909.05(I) provides that the PUCO must determine "[a]ny sums of money or property that the company may have received as total or partial defrayal of the cost of its property."

By omitting a specific formula in R.C. 4909.15(A)(1), the General Assembly has vested the PUCO with broad discretion in determining the appropriate allowances for working capital in utility rate cases. We believe that such determinations are lawfully within the expertise of the PUCO unless they are manifestly against the weight of the evidence and so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. See *Consumers' Counsel* v. *Pub. Util. Comm.* (1980), 64 Ohio St. 2d 71, 18 O.O. 3d 302, 413 N.E. 2d 799; *Columbus* v. *Pub. Util. Comm.* (1984), 10 Ohio St. 3d 23, 10 OBR 175, 460 N.E. 2d 1117.

The theory behind the working capital allowance is the recognition that a utility company must have additional investments in inventories of materials and supplies, and a certain amount of cash in order to sufficiently operate as a business. *Columbus* v. *Pub. Util. Comm., supra,* at 24, 10 OBR at 176, 460 N.E. 2d at 1119.

In the cases *sub judice,* the PUCO used lead-lag studies to verify and revise the formula for calculating the cash working capital allowances for each company.

The "formula approach" cal-

culates the working capital allowance as a fraction of the utility's annual operating expenses, less certain deductions. In the past, with regard to telephone companies, the PUCO has used the fraction of one-twelfth to make this calculation. See *Columbus* v. *Pub. Util. Comm., supra,* at 24, 10 OBR at 176, 460 N.E. 2d at 1119.

A lead-lag study attempts to measure the timing intervals between: (1) when services are rendered and revenues for those services are received, and (2) when the liabilities for the labor, materials, etc. used in providing service are incurred and when the expenses are paid. These differences are averaged over time and then expressed in terms of days. The days are then converted into a revenue-lag ratio and an expense-lag ratio. Finally, the ratios are applied to the utility's revenues and expenses to estimate the company's working capital requirement.

In Cincinnati Bell's case, the PUCO staff's revised formula resulted in the calculation of a $8,367,000 negative working capital requirement. However, the staff recommended a zero working capital allowance. The OCC made certain adjustments to the staff's methodology and recommended an $16,500,000 negative working capital allowance. The PUCO adopted the staff's recommendation and included a zero working capital allowance in the Cincinnati Bell order.

The revised formula which the PUCO staff used in Ohio Bell's case resulted in the calculation of a $3,816,000 working capital allowance, which the staff recommended (the staff recommendation was amended during the hearing to $6,492,000). The OCC made certain adjustments to the staff's methodology and recommended a $58,708,000 negative working capital allowance. The PUCO adopted the staff's revised recommendation and in-

cluded a $6,492,000 working capital allowance in the Ohio Bell order.

The OCC argues that the PUCO erred in both cases by failing to authorize negative working capital allowances pursuant to R.C. 4909.15(A)(1). The OCC contends that its negative lead-lag calculations prove that customers of Cincinnati Bell and Ohio Bell have provided funds to such an extent that the utilities' investors need not provide any capital to fund ongoing operations of the companies. In fact, since the customer-supplied funds are sufficient to partially offset the companies' rate base investments, the OCC contends that negative working capital allowances should be used so that investors will not earn a "windfall" return on capital to which they have not contributed.

In the alternative, the OCC argues that the PUCO should reduce the utilities' rate bases by deducting the negative lead-lag study results pursuant to R.C. 4909.05(J), since the lead-lag study results demonstrate that the companies have received customer funds which "defray or offset" the cost of the companies' property, in the context of R.C. 4909.05(I). In support of this contention, the OCC cites *Cincinnati* v. *Pub. Util. Comm.* (1954), 161 Ohio St. 395, 53 O.O. 304, 119 N.E. 2d 619 (hereinafter *"Cincinnati"*).

The PUCO rejected both of OCC's proposed adjustments, concluding, first, that R.C. 4909.15(A)(1) does not contemplate negative working capital allowances and, second, that the OCC had failed to prove that the negative working capital calculations in fact represented "customer-supplied funds" which satisfied the *Cincinnati* criteria set forth below, for deductions from rate base.

We agree with the PUCO's conclusion that R.C. 4909.15(A)(1) does not contemplate a "negative" working

capital allowance in a rate base determination. The plain and clear language of the statute requires an "allowance" for working capital requirements. We can only interpret that language to mean a positive allowance, or in appropriate circumstances such as found by the PUCO in Cincinnati Bell's case, an allowance of zero working capital.

We also agree with the PUCO's conclusion that the OCC's reliance on *Cincinnati* is misplaced. As the PUCO recognized in the Cincinnati Bell order, *Cincinnati* required that the PUCO deduct certain accrued balances of customer-supplied funds from the allowance for cash working capital and materials and supplies. The result on remand in *Cincinnati* was a zero working capital allowance, even though the accrued balances of the customer-supplied funds *exceeded* the PUCO's original working capital allowance. The PUCO order in the Cincinnati Bell case under review here is consistent with the result in *Cincinnati.*

Furthermore, the PUCO concluded that the OCC failed to prove that its proposed rate base deduction satisfied the *Cincinnati* criteria for deduction of customer-supplied funds. In *Cincinnati* we held that, before a particular account or fund is to be deducted from rate base, it must be shown to be (1) contributed from a non-investor source, (2) constant with reasonable certainty, and (3) available for investment by the utility. *Id.* at paragraph five of the syllabus.

The PUCO found that the negative results of the OCC's lead-lag studies and the PUCO staff's study in the Cincinnati Bell case did not prove the existence of any funds which should be deducted from rate base under the *Cincinnati* criteria. Specifically, the PUCO concluded that the negative results of the lead-lag studies did not establish the existence of any funds which were constant and available for investment with a reasonable degree of certainty:

"In analyzing and reviewing the lead-lag study of this company or any major utility, it becomes clear that revenues come in and payments go out on a daily basis. A lead-lag study only attempts to measure the differences in time frames between (1) when services are rendered and revenues for that service are received and (2) when the liability for labor, materials, etc., used in providing service is incurred and when the liability is paid * * *. These differences are averaged over time and also on a dollar weighted basis and are expressed in terms of days. The days are then converted into a revenue lag ratio and an expense lag ratio and then applied to current adjusted revenues and expenses to estimate the cash working capital requirement.

"It must be remembered that the lead-lag study can only provide an *average* of those differences in time frames. At any given point in time, depending on the day of the month and point in time in the billing cycle, the result of an actual computation of cash flows (to the extent one could be done) can and does fluctuate. Unlike customer deposits, or accruals for taxes or nuclear fuel disposal costs or rents collected to be paid in the future, it cannot be said that the results from a lead-lag study show an amount of money which is constant with reasonable certainty and available for investment."

Furthermore, the PUCO noted that the lead-lag studies in these cases did not include a number of factors which are typically necessary for the provision of utility service. We agree with the PUCO's conclusion that the adoption of the lead-lag studies in these cases would be unfair and inappropriate unless those excluded factors were given adequate consideration elsewhere in the ratemaking process.

Finally, the OCC contends that

because the practice of advance billing for service by the companies is the primary determinant of the negative results of the lead-lag studies, the customer-supplied funds are, in fact, determinable with a reasonable degree of certainty. In this regard, the OCC's argument is analogous to that made by the city of Cleveland which argued for a rate base deduction of budget billing balances in *Cleveland* v. *Pub. Util. Comm.* (1982), 70 Ohio St. 2d 290, 24 O.O. 3d 370, 436 N.E. 2d 1366. In *Cleveland,* we upheld the PUCO's rejection of the city of Cleveland's proposed adjustment on the basis of its conclusion that the budget billing balances were not so constant and available for investment as to justify deduction from rate base. In the cases *sub judice,* the PUCO concluded that the OCC's argument regarding advance billing balances suffered from the same infirmities as the argument for deduction of budget billing balances. *Cleveland, supra.* We agree.

In *Cleveland Elec. Illum. Co.* v. *Pub. Util. Comm.* (1976), 46 Ohio St. 2d 105, 108, 75 O.O. 2d 172, 173, 346 N.E. 2d 778, 781, we stated:

"The process of rate-making frequently involves extensive hearings, voluminous testimony, and the determination of difficult and abstruse technical questions which must be resolved on the basis of complex and often disputed evidence. The function of the commission is to carry through this process, in accordance with the statutory plan, and to fix lawful and reasonable rates based upon the evidence presented.

"The function and jurisdiction of this court in an appeal from an order of the commission is limited. Under R.C. 4903.13, our task is to affirm an order of the commission if it is not unreasonable or unlawful. This court has often emphasized the limited

nature of that authority. [Footnote omitted.]

"Our function is not to weigh the evidence or to choose between alternative, fairly debatable rate structures. That would be to interfere with the jurisdiction and competence of the commission and to assume powers which this court is not suited to exercise."

As was suggested in *Dayton* v. *Pub. Util. Comm.* (1962), 174 Ohio St. 160, 162, 21 O.O. 2d 427, 428, 187 N.E. 2d 150, 151: "[t]he members of this court are neither accountants nor engineers, and manifestly it would be unfair to the litigants and to the commission for the court to pretend that it is in a position to better evaluate the evidence and determine the difficult question of the reasonableness of the order than is the commission." See, also, *Cleveland* v. *Pub. Util. Comm., supra* (70 Ohio St. 2d 290).

The PUCO's considered analysis and disposition of the OCC's arguments for negative working capital allowances was succinctly summarized in the Cincinnati Bell order:

"In summary, we believe that a lead-lag study is superior to the formula method in calculating an estimated allowance for the cash component of working capital. The lead-lag study performed by the company in this case and adjusted by the staff and OCC did not include items such as prepayments, clearing accounts, deferred debits, minimum cash balances, compensating bank balances, and materials and supplies held for construction. Both the staff and OCC arrived at a negative result after they had made their adjustments. A negative figure which is the result of a lead-lag study does not represent an amount of money which is constant with reasonable certainty and available for investment by the company. Such a

negative figure does not represent a sum of money received from noninvestors as a total or partial defrayal of the cost of property. It would be unreasonable and inappropriate to deduct the negative result of the lead-lag study from rate base when no consideration was given to prepayments, clearing accounts, deferred debits, minimum bank balances, compensating bank balances, or materials and supplies held for construction purposes. Such a deduction from rate base would not, as a policy matter, promote efficient cash management. We believe that neither the General Assembly nor the Ohio Supreme Court intended that a negative result from a lead-lag study be deducted from rate base. Rather, such a negative result simply means that investors are not required to provide capital to the utility company over and above the level of investment in plant and other specifically identified rate base items."

It is clear that the PUCO fairly and exhaustively analyzed the OCC's contentions and arguments in exercising its expertise and discretion to determine the appropriate working capital allowances for Cincinnati Bell and Ohio Bell.

The OCC has not shown that PUCO's refusals to use negative working capital allowances or to deduct the negative results obtained from the lead-lag studies from the companies' rate bases were unreasonable or unlawful. The PUCO's determinations were neither manifestly against the weight of the evidence nor so unsupported by the record as to show misapprehension, mistake or willful disregard of duty.

The OCC's propositions of law are overruled.

B

Next, we consider the OCC's contention that the PUCO overvalued Cincinnati Bell's and Ohio Bell's rate bases by failing to exclude noncash items from the working capital calculations.

The OCC argues that, pursuant to R.C. 4905.15(A)(1), depreciation expenses, deferred income tax, deferred investment tax credits and return on common equity should all have been eliminated from the rate bases. Since these are "noncash" items, the OCC contends that they cannot properly be included in the cash working capital allowance contemplated by that statute.

These issues were recently addressed by this court in *Consumers' Counsel* v. *Pub. Util. Comm.* (1986), 25 Ohio St. 3d 213, 216-217, 25 OBR 275, 277-278, 495 N.E. 2d 930, 933-934:

"The next question is whether the PUCO's inclusion of depreciation, deferred taxes, deferred investment tax credits and return on common equity in the lead-lag study performed in this case was unlawful or unreasonable. Although these four items are not generally thought of as involving cash outlay, they reflect the fact that investors at one time provided cash, which is recovered over time from rate payers. [Footnote omitted.] The PUCO, thus, reasons that it obtains the most accurate reflection of its day-to-day working capital requirement by including depreciation, deferred taxes, deferred investment tax credits and return on common equity in its formula for determining cash working capital.
"* * *

"In conclusion, OCC has not demonstrated that the PUCO's inclusion of the four items in question in the lead-lag study used to test the validity of the formula for computation of cash working capital was contrary to law."

On authority of *Consumers' Counsel, supra* (25 Ohio St. 3d 213),

the OCC's proposition of law is rejected.

C

The OCC's fourth contention is that the PUCO erred by improperly including interstate revenues in the calculations of the companies' cash working capital allowances.

This issue was addressed by the PUCO in the Ohio Bell order:

"Because the information necessary to conduct a purely intrastate study is not available, the Commission agrees with its staff that the use of total company revenue and expense data is reasonable."

We agree with the PUCO that if revenues are considered only on an intrastate basis, then consistency would dictate that expenses be considered only on an intrastate basis. The record indicates, however, that no attempt was made by any of the parties to restrict its analysis only to intrastate operations. In fact, the PUCO's order implies that the information required to make such a separation is not even available.

R.C. 4909.15(A)(1) requires the PUCO to include, as part of a company's rate base, "a reasonable allowance for * * * cash working capital, as determined by the public utilities commission." This provision has been held to grant broad discretion to the PUCO, the only restriction being that this court will reverse the PUCO's determination if it is unreasonable or unlawful. *Columbus* v. *Pub. Util. Comm.*, *supra* (10 Ohio St. 3d 23), at 24-25, 10 OBR at 177, 460 N.E. 2d at 1119. *Consumers' Counsel* v. *Pub. Util. Comm.*, *supra* (25 Ohio St. 3d 213), at 216, 25 OBR at 277, 495 N.E. 2d at 932. The OCC has presented nothing that would indicate that the PUCO's decision to include the companies' interstate revenues in its lead-lag calculation is unreasonable or unlawful.

The OCC's proposition of law is rejected.

D

The OCC next contends that the PUCO erred by failing to properly recognize the full deduction for customer advancements for excise taxes from the working capital allowances.

In each of the cases *sub judice,* the PUCO made a deduction from the working capital allowance based upon the company's advance collection of four percent of the four and .75 percent Ohio Utility Excise Tax. The OCC does not challenge that aspect of the orders, but argues that the PUCO erred by not making a further adjustment for the remaining .75 percent of the excise tax.

The PUCO concluded that the records in these cases unequivocally demonstrate that the .75 percent portion of the excise tax was continually paid *before* the companies were reimbursed by the customers. Thus, that portion of the tax was neither a constant source of customer-supplied funds nor a source of funds which were available for investment.

As the PUCO staff witness Deborah A. Hensel testified:

"When the legislature passed the bill a few years ago approving the additional .71% excise tax, the commission granted those companies who requested it permission to collect the additional .71% excise tax through a surcharge rider. However, recovery from the customers began after the company paid the taxes. Most utilities were not granted permission to begin charging the rider until the fall. Meantime, the company had already made the first three payments for that fiscal year, including the additional .71%.

"The next year, the legislature increased the .71% additional tax to .75%. Utilities again could request a surcharge rider. However, recovery of the .75% could not begin until the entire .71% tax liability had been recovered. When the legislature made the entire .75% additional tax permanent, utilities could again request permission to continue its [*sic*] surcharge rider. Again, the restriction was made that the previous .75% tax liability had to be entirely rcovered [*sic*] before requesting permission to continue the rider.

"The company did not begin to charge a surcharge rider for the permanent .75% excise tax until January 1, 1984. However, the company was required to make the first three estimated payments reflecting not only the 4% tax but also the .75% tax prior to this date. As can be seen, collection of the .75% tax from customers has continuously lagged payment by the company."

In view of this unrefuted testimony, the PUCO's refusal to make a deduction for the .75 percent excise tax increase was reasonable.

The OCC's proposition of law is rejected.

### E

The final issue we consider is the OCC's contention that the PUCO erred by failing to require Cincinnati Bell to cease its practice of billing in advance of rendering service.

R.C. 4905.13 gives the PUCO the authority to "establish a system of accounts to be kept by public utilities * * *." We have recognized that "the commission has express statutory authority under R.C. 4905.13 to prescribe the manner in which a utility must keep its books of account." *Consumers' Counsel* v. *Pub. Util. Comm.* (1983), 4 Ohio St. 3d 111, 115, 4 OBR 358, 363, 447 N.E. 2d 749, 754. Thus, this court generally will not interfere with the accounting practices set by the commission. Cf. *Consumers' Counsel* v. *Pub. Util. Comm.* (1983), 6 Ohio St. 3d 377, 6 OBR 428, 453 N. E. 2d 673.

Since a company's billing practices are an integral part of its accounting system, and given the discretion possessed by the PUCO in this respect, we cannot say that the PUCO acted unreasonably or unlawfully by allowing a utility to charge a flat rate for local service before such service is actually rendered.

The OCC's proposition of law is rejected.

### II

In light of all the foregoing, we affirm the PUCO orders in both of the cases before us.

*Orders affirmed.*

SWEENEY, Acting C.J., O'NEILL, HOLMES, DOUGLAS and WRIGHT, JJ., concur.

LOCHER and H. BROWN, JJ., concur in part and dissent in part.

SWEENEY, J., sitting for MOYER, C.J.

O'NEILL, J., of the Seventh Appellate District, sitting for SWEENEY, J.

LOCHER, J., concurring in part and dissenting in part. I concur in the holding of the majority that certain "noncash" items can properly be included in the cash working capital allowance contemplated by R.C. 4909.15(A)(1) based upon our decision in *Consumers' Counsel* v. *Pub. Util. Comm.* (1986), 25 Ohio St. 3d 213, 25

OBR 275, 495 N.E. 2d 930. I concur in judgment only with respect to the issues concerning interstate revenue, excise taxes, and billing practices. Otherwise, I dissent.

I cannot agree with the majority that the PUCO did not err in failing to deduct customer-provided working capital from the rate base of the companies involved herein. *Cincinnati* v. *Pub. Util. Comm.* (1954), 161 Ohio St. 395, 53 O.O. 304, 119 N.E. 2d 619, requires a deduction for customer-provided funds which will be constant with reasonable certainty in the foreseeable future and which are available for investments in materials and supplies, or for use as working capital.

In the instant case, the customer-provided funds consist of payments made in advance of service for local calls. These prepaid funds are a primary determinant of the negative results in the lead-lag studies. Both companies, like most local telephone companies, charge consumers a flat rate for local service. It is disturbing that the PUCO and the majority conclude that these payments made in advance of service are not capable of calculation with reasonable certainty. In my view, these customer-provided funds are determinable with a reasonable degree of certainty. The telephone companies obviously know what they charge as a flat rate. The companies can also easily determine how many customers they service. Simple mathematics can also determine the total amount of these advance payments that are received month after month. A capable lead-lag study can arrive at an average.

Furthermore, to reinforce the view taken by the PUCO, the majority relies upon *Cleveland* v. *Pub. Util. Comm.* (1982), 70 Ohio St. 2d 290, 24 O.O. 3d 370, 436 N.E. 2d 1336. This reliance is misplaced. *Cleveland* involved the question of whether customers' equalized payments under East Ohio Gas Company's budget billing plan should be deducted from the rate base as customer-provided funds. In that case, the PUCO found that natural gas sales fluctuated widely depending upon weather conditions. This fluctuation defeated Cleveland's contention that the budget billing generated constant funds with reasonable certainty. To the contrary, telephone companies' "sales" and working capital requirements are not affected by weather fluctuations. In fact, their billings possess no similarity to a gas distribution company's budget system. As of the date certain in this case, approximately 416,000 of Cincinnati Bell's 424,000 residence customers paid a monthly flat rate for basic service, in advance of the service month. *Cleveland* is not dispositive. Therefore, I cannot agree that the advance billings in the instant case are not constant and available.

I realize that the PUCO entered an allowance for working capital of zero. However, where there is no working capital against which to make an offset, any offset should be made directly against the company's rate base. "We only require that due account be taken of customer deposits. If the formula is not designed to accommodate an offset to working capital, and we were not informed by the parties on this matter, then it may be necessary to deduct customer deposits directly from the rate base. The result would be the same." *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108, 115, 12 O.O. 3d 115, 119, 388 N.E. 2d 1370, 1375. The rationale for an offset is to permit investors to earn a return *only* on that property for which *they* have supplied funds, not on funds contributed by *customers. Id.* See, *e.g., Consumers' Counsel* v. *Pub. Util.*

*Comm.* (1983), 4 Ohio St. 3d 111, 4 OBR 358, 447 N.E. 2d 749. Today's decision totally ignores that well-established principle.

I am also deeply disturbed with the manner in which the majority reaches today's decision. Throughout the majority opinion, extensive reference is made to the "expertise" of the PUCO. I certainly hope that this casual approach to affirming the PUCO decision will not prevail in all utility cases before us. This is due to my concern that a utility company "is a quasi-public corporation and has possessed a virtual monopoly * * *. The public interest increases with a monopoly, for, as such, its actions are not regulated by the strictures of the market place." *Central State University* v. *Pub. Util. Comm.* (1977), 50 Ohio St. 2d 175, 180, 4 O.O. 3d 373, 375, 364 N.E. 2d 6, 9 (Locher, J., dissenting).

If this extreme deference to the PUCO had prevailed in the past, every consumer in Ohio would still be paying for the advertisements and charitable contributions of this state's utility companies. See *Cleveland* v. *Pub. Util. Comm.* (1980), 63 Ohio St. 2d 62, 17 O.O. 3d 37, 406 N.E. 2d 1370. The PUCO, the legislature and this court must make certain that utility companies are properly regulated for the primary benefit of consumers. Thus, in reviewing the decision of the PUCO, this court should not lightly grant its imprimatur.

Based on the foregoing, I would remand this case to the PUCO to calculate the amount of customer-provided funds that should be offset against the rate base.

H. Brown, J., concurs in the foregoing opinion.