OPINIONS OF THE SUPREME COURT OF OHIO

The full texts of the opinions of the Supreme Court of Ohio are being transmitted electronically beginning May 27, 1992, pursuant to a pilot project implemented by Chief Justice Thomas J. Moyer.

Please call any errors to the attention of the Reporter's Office of the Supreme Court of Ohio. Attention: Walter S. Kobalka, Reporter, or Deborah J. Barrett, Administrative Assistant. Tel.: (614) 466-4961; in Ohio 1-800-826-9010. Your comments on this pilot project are also welcome.

NOTE: Corrections may be made by the Supreme Court to the full texts of the opinions after they have been released electronically to the public. The reader is therefore advised to check the bound volumes of Ohio St.3d published by West Publishing Company for the final versions of these opinions. The advance sheets to Ohio St.3d will also contain the volume and page numbers where the opinions will be found in the bound volumes of the Ohio Official Reports.


Cincinnati Gas & Electric Company, Appellant, v. Public Utilities Commission of Ohio et al., Appellees.
[Cite as Cincinnati Gas & Elec. Co. v. Pub. Util. Comm. (1993),    Ohio St.3d    .]
Public Utilities Commission -- Conversion of nuclear power plant to coal-fired facility -- Application for rate increase -- Commission without statutory authority to phase in gross annual revenue increase to which commission found electric company entitled under R.C. 4909.15(B) -- Computing electric company's working capital allowance.
(No. 92-1744 -- Submitted June 2, 1993 -- Decided November 3, 1993.)
Appeal from the Public Utilities Commission of Ohio, No. 91-410-EL-AIR.

On April 2, 1991, appellant, Cincinnati Gas & Electric Company ("CG&E"), filed an application with appellee, Public Utilities Commission of Ohio, to increase its rates for electric service. The application was filed, in large part, to enable CG&E to receive a return on its jurisdictional share of investment ($1,216,610,000) in the William H. Zimmer Generating Station ("Zimmer"). (For a more complete history of this case, see the companion case of Columbus S. Power Co. v. Pub. Util. Comm. [1993],    Ohio St.3d   ,    N.E.2d   , decided this date.)

By its order of May 12, 1992, the commission made deductions, as pertinent to this appeal, to the proposed Zimmer rate base for improperly accrued AFUDC, nuclear fuel expense, and nuclear wind-down costs. It then ordered the resulting revenue increase ($114,629,000) phased in over a period of three years, and also authorized recovery of the deferrals created in years one and two of the phase-in over a ten-year period, with carrying charges.

On July 2, 1992, the commission denied CG&E's application for rehearing on the issues raised in this appeal. This cause is now before this court upon an appeal as of right.


Squire, Sanders & Dempsey, Alan P. Buchmann, Arthur E. Korkosz, Debra J. Horn and Lisa R. Battaglia; James J. Mayer

and Michael A. Gribler, for appellant.

Lee I. Fisher, Attorney General, James B. Gainer, Duane W. Luckey, Thomas W. McNamee, Kaye Pfister Willi, Jeffrey D. Van Niel and Paul A. Colbert, Assistant Attorneys General, for appellee.

Vicki Miller, Acting Consumers' Counsel, Richard W. Pace, Sr., Evelyn R. Robinson-McGriff and Barry Cohen, Associate Consumers' Counsel, for intervening appellee Office of Consumers' Counsel.

Bell, Royer & Sanders Co., L.P.A., Langdon D. Bell and Barth E. Royer, for intervening appellee Industrial Energy Consumers.

Boehm, Kurtz, & Lowry and David F. Boehm, for intervening appellees Armco Steel Company, L.P. and Air Products & Chemicals Corporation.

Beckman, Weil, Shephardson & Faller and Richard M. Hopple;  Lee I. Fisher, Attorney General, and Sidney Weil, Special Counsel, for intervening appellee University of Cincinnati.

Millikin & Fitton Law Firm and James E. Michael; Lee I. Fisher, Attorney General, and James S. Irwin, Special Counsel, for intervening appellee Miami University.

Fay D. Dupuis, City Solicitor, and Richard Ganulin, Assistant City Solicitor, for intervening appellee city of Cincinnati.

Moyer, C.J.  CG&E raises four propositions of law: (1) the commission is without statutory authority to phase in the gross annual revenue increase to which the commission found CG&E entitled under R.C. 4909.15(B); (2) assuming the commission has such phase-in authority, the phase-in plan ordered in this proceeding is unlawful in that it authorizes a post-date-certain adjustment to the Zimmer rate base in violation of R.C. 4909.15(A)(1); (3) the disallowances related to AFUDC, nuclear fuel, and nuclear wind-down costs violate a prior stipulation approved by the commission; and (4) the commission erred in computing the company's working capital allowance.

I

CG&E's first three propositions of law raise the same issues and arguments as those presented and decided in the companion case of Columbus S. Power Co., supra.  On the authority of that case, we sustain CG&E's first proposition of law, find its second proposition to be moot, and overrule the third.

Further, consistent with our decision in Columbus S. Power Co., we instruct the commission on remand to fix rates which provide CG&E the gross annual revenues determined in accordance with R.C. 4909.15(B) and (D)(2)(b), and to provide a mechanism by which CG&E may recover those revenues deferred to the time the order on remand is issued.

II

As set forth in R.C. 4909.05 and 4909.15(A)(1), the value of a utility's property, or its rate base, "'consists of the actual net investment in the assets of a utility, including the original cost of long term assets [R.C. 4909.05(C), (D), (E), (F) and (G)], less depreciation and contributions of capital

[R.C. 4909.05(H) and (I)], plus short term assets in the form of cash working capital [R.C. 4909.15(A)(1)].'" Babbit v. Pub. Util. Comm. (1979), 59 Ohio St.2d 81, 89-90, 13 O.O.3d 67, 72, 391 N.E.2d 1376, 1381, quoting Franklin Cty. Welfare Rights Org. v. Pub. Util. Comm. (1978), 55 Ohio St.2d 1, 11, 9 O.O.3d 1, 6, 377 N.E.2d 990, 997. In authorizing the working capital allowance, R.C. 4909.15(A)(1) provides for "a reasonable allowance for materials and supplies and cash working capital." We have recognized that, "[b]y omitting a specific formula in R.C. 4909.15(A)(1), the General Assembly has vested the PUCO with broad discretion in determining the appropriate allowances for working capital in utility rate cases." Consumers' Counsel v. Pub. Util. Comm. (1987), 32 Ohio St.3d 263, 265, 513 N.E.2d 243, 246.

In computing the working capital allowance, the commission traditionally determines an amount for the materials and supplies component and an amount for the cash component (determined by using a lead-lag study1) and adds, or nets, those sums as the case may be. Although the record in this proceeding is somewhat confused by the commission staff's omission of the traditional line item for "cash working capital" in its staff report, we find its omission to be one of form and its methodology in computing the working capital allowance to be the same as in previous cases, as is recognized by the parties on appeal. Accordingly, for purposes of our review, we accept that the lead-lag study adopted in this case resulted in a "negative cash working capital" requirement.

This negative requirement was derived from the lead-lag study by netting the revenue lag dollars (which represent a need for cash working capital) against the expense lag dollars (which represent a source of cash working capital).2 The negative amount of $27,335,000 was then effectively netted against the material and supplies (and miscellaneous working capital) requirement of $128,800,000 to arrive at a total working capital allowance of $101,465,000.

CG&E argues that it is unlawful to net the negative cash working capital requirement against the remaining working capital components. It reasons that R.C. 4909.15(A)(1) expressly distinguishes between materials and supplies and cash working capital and that a separate allowance must be established for each. Assuming as much, and relying on our decision in Consumers' Counsel v. Pub. Util. Comm. (1987), 32 Ohio St.3d 263, 513 N.E.2d 243, CG&E argues that the cash working capital "allowance" cannot be a negative amount, but must be set at zero. We reject CG&E's arguments and, for the reasons which follow, affirm the commission on this issue.

While it is true that R.C. 4909.15(A)(1) differentiates between the materials and supplies and the cash component of the working capital allowance, it does not require that a separate allowance be set for each for ratemaking purposes. Rather, its plain language requires only that "a reasonable allowance" composed of both components be determined. Recognizing as much, this court has permitted offsets to materials and supplies by what would strictly be construed as "cash" items, when they were not otherwise considered by the commission's working capital methodology. See Cincinnati v. Pub. Util. Comm. (1954), 161 Ohio St. 395, 53 O.O. 304, 119

N.E.2d 619, paragraph five of the syllabus, in which we held that "*** customers' contributions in the form of accurals [sic] for the payment of taxes, deposits to secure the payment of customers' bills for service or as advances on installation charges, and collections of rents to be paid at future dates, which will be constant with reasonable certainty in the foreseeable future and which are available for investment in materials and supplies, or for use as working capital, should be used as an offset on the allowance for working capital, including investments in materials and supplies necessary for the normal operations of the company and for plant maintenance and repair."  As we recognized in Consumers' Counsel v. Pub. Util. Comm. (1983), 4 Ohio St.3d 111, 113, 4 OBR 358, 360, 447 N.E.2d 749, 752, "[t]he principle underlying this holding is that investors in public utilities should be permitted to earn a return only on that property for which they have supplied funds, not on funds contributed by customers."

There is no question on appeal but that the expense lag dollars at issue represented non-investor funds and were available to offset CG&E's cash working capital needs. Consistent with R.C. 4909.15(A)(1) and our established precedent, the commission's determination that those funds were also available as an offset to the materials and supplies requirement was neither unlawful nor unreasonable.

So finding, we also reject CG&E's argument that Consumers' Counsel (1987) is controlling.  There, as here, the commission determined the utility's materials and supplies requirement to be a positive amount and its cash working capital requirement, using a lead-lag study, to be a negative amount.  However, unlike this case, the sum of the requirements resulted in an overall negative figure of $8,367,000.  The commission set the overall working capital allowance at zero, permitting the negative cash component to offset the materials and supplies requirement.  See In re Cincinnati Bell Tel. Co. (Oct. 29, 1985), PUCO No. 84-1272-TP-AIR, at 8.  On appeal, the Office of Consumers' Counsel ("OCC") argued that the commission erred by failing to authorize a negative working capital allowance under R.C. 4909.15(A)(1).  We rejected this argument, stating:

"We agree with the PUCO's conclusion that R.C. 4909.15(A)(1) does not contemplate a 'negative' working capital allowance in a rate base determination.  The plain and clear language of the statute requires an 'allowance' for working capital requirements.  We can only interpret that language to mean a positive allowance, or in appropriate circumstances such as found by the PUCO in [this] case, an allowance of zero working capital."  Consumers' Counsel (1987), 32 Ohio St.3d at 266-267, 513 N.E.2d at 247.

Contrary to CG&E's assertions, this language does not recognize a separate allowance for cash working capital, nor does it provide that a negative cash working capital requirement cannot be used as an offset to the materials and supplies requirement.  Rather, it stands only for the proposition that R.C. 4909.15(A)(1) does not contemplate an overall negative working capital allowance.

Finally, CG&E relies on our adoption of the commission's statement in Consumers' Counsel (1987) that "neither the General Assembly nor the Ohio Supreme Court intended that a

negative result from a lead-lag study be deducted from rate base."  Id. at 269, 513 N.E.2d at 249.  It argues that the offset to the materials and supplies requirement in this case will have the same effect, and thus is unlawful.

CG&E's argument ignores that the commission's offset to the materials and supplies component in Consumers' Counsel (1987) also had the effect of reducing rate base.  Moreover, it ignores that the statement was made in response to OCC's alternative argument that, if R.C. 4909.15(A)(1) did not contemplate a negative working capital allowance, the negative cash component should be deducted directly from rate base under R.C. 4909.05(J) and (I).3  Whether such funds should also be considered as available to offset the original cost of the company's long-term assets is not an issue before us.  We hold only that it was lawful and reasonable for the commission to offset the materials and supplies requirement with these customer-provided funds in determining the company's working capital needs under R.C. 4909.15(A)(1).

> Order affirmed in part,
> reversed in part
> and cause remanded.

A.W. Sweeney and Deshler, JJ., concur.
Douglas, J., concurs separately.
Resnick, F.E. Sweeney and Pfeifer, JJ., dissent.
Dana A. Deshler, J., of the Tenth Appellate District, sitting for Wright, J.

FOOTNOTES
1    "A lead-lag study attempts to measure the timing intervals between: (1) when services are rendered and revenues for those services are received, and (2) when the liabilities for the labor, materials, etc. used in providing service are incurred and when the expenses are paid."  Consumers' Counsel (1987), supra, 32 Ohio St.3d at 266, 513 N.E.2d at 246.
2    Revenue lag dollars reflect that investors have provided cash to the utility for items prior to the utility's receiving cash from its customers.  Expense lag dollars represent non-investor supplied funds which are provided by the utility's postponing payments to employees, vendors, tax authorities, and others beyond the date that the service is provided by these groups.  A negative cash working capital requirement exists when the expense lag exceeds the revenue lag, and merely indicates that the utility is receiving cash from its customers faster than it must be disbursed.
3    R.C. 4909.05(J) provides, in part:
     "The valuation of the property of the company, which shall be the sum of the amounts contained in the report pursuant to divisions (C), (D), (E), (F), and (G) of this section, less the sum of the amounts contained in the report pursuant to divisions (H) and (I) of this section."
     R.C. 4909.05(I) provides:
     "Any sums of money or property that the company may have received as total or partial defrayal of the cost of its property."

Douglas, J., concurring.     I concur with the majority

(subject to my concurrence in Columbus S. Power Co. v. Pub. Util. Comm. [1993],    Ohio St.3d    ,    N.E.2d   ) in the holdings found in Part I of the opinion.  I concur, reluctantly, with the holding in Part II of the opinion and do so in order to obtain a majority for a decision of this court. I agree with, and have generally supported, the commission's broad discretion in ratemaking matters.  I have reservations in this case on this issue, however, because I think R.C. 4909.15(A)(1) does not permit (nor do I think it makes any accounting sense) to set "cash working capital" at a negative figure.  It is difficult for me to understand how the terms "cash" and "allowance" can equate to a negative number.  The proper action, I believe, was for the commission to set the cash working capital allowance at zero.

I am not as ready to accept and assume, as has the majority, that "* * * the commission staff's omission of the traditional line item for 'cash working capital' in its staff report * * * [is] one of form and its methodology in computing the working capital allowance * * *."  I have always found the commission, its staff and its legal representation to be exceptional in their work.  In every previous case that I can recall, such a line item (by necessity, of course) was included.  If such an entry had been included, it would have shown, because of the accepted lead-lag study, a "negative cash working capital" figure.  It is more likely, I think, that the line item was "overlooked" because the staff recognized that in Consumers' Counsel v. Pub. Util. Comm. (1987), 32 Ohio St.3d 263, at 266-267, 513 N.E.2d 243, at 247, this court stated: "We agree with the PUCO's conclusion that R.C. 4909.15(A)(1) does not contemplate a 'negative' working capital allowance in a rate base determination.  The plain and clear language of the statute requires an 'allowance' for working capital requirements.  We can only interpret that language to mean a positive allowance, or in appropriate circumstance such as found by the PUCO in Cincinnati Bell's case, an allowance of zero working capital."  (Emphasis added.)

As it does with the retroactive ratemaking issue, the majority strives to talk its way around the working capital issue, but I find it difficult to subscribe, without comment, to these positions of the majority.  Accordingly, I continue to adhere to the position I have taken in Columbus S. Power Co. v. Pub. Util. Comm., supra, on the question of retroactive ratemaking and the position set forth above on the issue of working capital.  In doing so, however, I concur in the judgment of the majority.